**Joseph, Claire, and Anthony VARRONE, Plaintiffs,**

v.

**Michael BILOTTI, et al., Defendants.**

**No. 92–CV–1290 (JRB).**

United States District Court, E.D. New York.

Oct. 6, 1994.

Bernard W. McCarthy, Nancy L. Woodhouse, Chadbourne & Parke, New York City, for plaintiffs.

Robert Abrams, Atty. Gen. by Frederic L. Lieberman, New York City, for defendants.

## MEMORANDUM–DECISION AND ORDER

BARTELS, District Judge.

Defendant John Matthews moves this Court under Rule 56 of the Federal Rules of Civil Procedure for summary judgment. Plaintiff Anthony Varrone moves under Rule 15 for an order granting him leave to amend

the complaint to name six additional known defendants and ten unidentified "John Doe" defendants. For the reasons set forth below, the defendant's motion for summary judgment is denied and the plaintiff's motion to amend is granted.

## BACKGROUND

At the time of the events precipitating this action,[1] Joseph Varrone was incarcerated at the Arthur Kill Correctional Facility in New York (the "Facility"). On March 8, 1989, Joseph's son, plaintiff Anthony Varrone, and his companion, Susan Wight, spent what prison officials term a "contact visit" with Joseph at the Facility during regular visitation hours. This visit prompted prison security to subject Joseph to a strip search, a procedure they contend is performed routinely on inmates after contact visits. Although the strip search proved negative for contraband, security personnel placed Joseph in the Special Housing Unit ("SHU"), an area of solitary confinement within the Facility, where he was held for a period of twenty-seven hours. While Joseph was confined in SHU, authorities failed to uncover the presence of any contraband during an inspection of his bowel movement.

Plaintiff alleges that defendant violated 42 U.S.C. § 1983 on March 10, 1989, when he again visited his father at the Facility. Upon his arrival, defendant Matthews, a Facility correction sergeant assigned to the visiting room at the relevant time, informed plaintiff that he must submit to a strip search before he would be granted visitation privileges.[2] A sign posted outside the Facility expressly warns that "[a]ll visitors are subject to searches as a condition of visitation." (*See* Affidavit of Brian Malone, sworn to November 24, 1993 [the "Malone Aff."], Exhibit C.)

More importantly, plaintiff admits having signed a "Consent to Search" form (*id.*, Ex. E) before defendant Matthews escorted him to a private room, where a full-body search proved negative for contraband.

The account offered by defendant Matthews tells virtually the same story with a few important elaborations. Matthews claims that on March 3, 1989, Kings County Assistant District Attorney Eric Seidel telephoned Brian Malone, the Inspector General for the New York State Department of Correctional Services ("DOCS"), to notify him that ADA Seidel had received information regarding possible drug trafficking by Joseph, Claire, and Anthony Varrone. Specifically, ADA Seidel stated that he had been told by a "reliable source" that Anthony and Claire Varrone planned to visit Joseph within the near future, and that they would attempt to transport heroin into the Facility at that time.

After reviewing records pertaining to Joseph Varrone's conviction for criminal sale of a controlled substance, and armed with the knowledge that DOCS currently was investigating allegations of instances of drug smuggling at the Facility (none of which implicated Joseph Varrone, however), Malone directed Deputy Inspector General Thomas Mansfield to ensure that prison personnel subjected both Claire and Anthony Varrone to a strip search before their next visit. Deputy Inspector Mansfield then assigned the matter to Investigator Juan Ramos with instructions to contact senior security staff at the Facility. On March 6, 1989, Investigator Ramos provided Gerald Wells, Deputy Superintendent for Security at the Facility, with Malone's orders to search any visitor before allowing them to see Joseph Varrone. (*See* Malone Aff., Ex. B.) Apparently, this order

---

1. By order dated October 26, 1992, this Court consolidated three separate actions brought pursuant to 42 U.S.C. § 1983. On September 22, 1993, the Court dismissed as untimely all of the claims asserted by plaintiffs Joseph and Claire Varrone. Plaintiff Anthony Varrone then voluntarily dismissed his claims against defendants Michael Bilotti, Francisco Berrios, and Bert Ross. Because defendant Raymond Bara died prior to commencement of the present action, the only claims left remaining are those asserted by plaintiff against defendant John Matthews.

2. Claire Varrone had attempted to visit her husband Joseph on March 9, 1989, when, upon her arrival at the Facility, she too was told that before she would be permitted to see Joseph she must submit to a strip search. Although the search of Claire Varrone uncovered no illegal contraband, authorities allowed only a non-contact visit. Claire Varrone's Section 1983 claim was based on this strip search.

eventually was carried out by defendant Matthews.

## DISCUSSION

### A. Defendant's Motion for Summary Judgment

■ Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the record demonstrates clearly that "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 571–73 (2d Cir.1991). The party seeking summary disposition bears the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2558, 91 L.Ed.2d 265 (1986). The court's function on such a motion is to "assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991).

Defendant's motion launches a multi-tiered attack, arguing that Anthony Varrone has failed to state a violation of his constitutional rights because he retained no legitimate expectation of privacy once he entered the Facility. Alternatively, Matthews asserts that even if plaintiff did enjoy a legitimate privacy expectation, he expressly consented to the strip search and thereby waived any Fourth Amendment protections he may have had. In any event, Matthews claims the search was based on reasonable suspicion, and thus passes constitutional muster. A second line of defense asserts that Matthews himself cannot be held liable should the Court find that the strip search was constitutionally unreasonable. First, Matthews relies on the principle that in order to establish liability in a Section 1983 action, plaintiff must demonstrate personal involvement on the part of a defendant. Matthews argues further that even if he were involved personally in the search, the doctrine of qualified immunity shields him from liability. Each of defen-

dant's contentions here will be dealt with separately.

### 1. Plaintiff Retained a Legitimate Expectation of Privacy While Visiting the Facility

■ Plaintiff did not abandon his constitutional right to be free from unreasonable government intrusion when he entered the Facility to visit his father. While the Court of Appeals for the Second Circuit has recognized that "[c]ontacts between inmates and noninmates may justify otherwise impermissible intrusions into the noninmates' privacy," *United States v. Willoughby*, 860 F.2d 15, 21 (2d Cir.1988), *cert. denied*, 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989), neither that court, nor any other circuit court, has held that the need to maintain prison security justifies wholesale abrogation of rights protected by the United States Constitution. Indeed, the circuit courts generally agree that a prison visitor retains a Fourth Amendment right to be free from unreasonable searches and seizures. *See, e.g., Boren v. Deland*, 958 F.2d 987 (10th Cir.1992); *Cochrane v. Quattrocchi*, 949 F.2d 11 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Daugherty v. Campbell*, 935 F.2d 780 (6th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992); *Smothers v. Gibson*, 778 F.2d 470 (8th Cir.1985); *Thorne v. Jones*, 765 F.2d 1270 (5th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 313 (1986).

■ Although plaintiff retained a legitimate expectation of privacy while in the Facility, the Court agrees with defendant that any such expectation necessarily was diminished. The Second Circuit has recognized that noninmates possess legitimate expectations of privacy; the court has noted, however, that "in light of the difficult burdens of maintaining safety, order and security," these privacy expectations diminish when one enters a correctional facility. *Security and Law Enforcement Employees v. Carey*, 737 F.2d 187, 204 (2d Cir.1984). As stated by the Court of Appeals for the First Circuit, "[t]o be sure, those visiting a prison cannot credibly claim to carry with them the full panoply

of rights they normally enjoy. But neither may they constitutionally be made to suffer a wholesale loss of rights...." *Blackburn v. Snow,* 771 F.2d 556, 563 (1st Cir.1985). Accordingly, once inside the Facility plaintiff enjoyed a legitimate, albeit diminished, expectation that he would be free from unwarranted government intrusion into his bodily privacy.

2. *Whether the Strip Search of Plaintiff Was Supported by Reasonable Suspicion Raises an Issue of Material Fact*

■ The Court finds that defendant Matthews has failed to demonstrate that, as a matter of law, the gross invasion of plaintiff's Fourth Amendment rights was supported by reasonable suspicion. The Fourth Amendment "vests individuals with the right to be free from 'unreasonable government intrusions into their legitimate expectations of privacy.'" *Carey,* 737 F.2d at 201 (quoting *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 [1977] ). Having concluded that Anthony Varrone enjoyed a legitimate privacy expectation while a visitor at the Facility, it now is incumbent upon defendant to establish that the government's intrusion on that privacy right was reasonable. The United States Supreme Court has held that to determine the reasonableness of a strip search conducted at a correctional facility, "the court must balance the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). Application of this balancing test has led the courts to adopt a reasonable suspicion standard to govern the conduct of strip searches of prison visitors. *See, e.g., Boren,* 958 F.2d at 988; *Cochrane,* 949 F.2d at 13; *Daugherty,* 935 F.2d at 784; *Thorne,* 765 F.2d at 1277; *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982).

■ In weighing the severity of the intrusion involved here against its alleged justification, the Court is mindful that a strip search involves a grave violation of bodily privacy. *See, e.g., Cochrane,* 949 F.2d at 13 (a strip search "'constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual'") (quoting *Burns v. Loranger,* 907 F.2d 233, 235 n. 6 [1st Cir.1990] ); *Hunter,* 672 F.2d at 674 ("a strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience"). Thus, although the courts are bound to accord great weight to the interest prison officials have in intercepting contraband and maintaining prison security, *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878; *Blackburn,* 771 F.2d at 564, the inherently invasive nature of a strip search requires a greater showing of necessity to justify its conduct.

■ Matthews's proof falls short of making the requisite showing of necessity. Defendant contends that the information provided by ADA Seidel's unidentified "reliable source" and general suspicions of drug smuggling at the Facility alone warranted a search of plaintiff. However, "'[t]o justify the strip search of a particular visitor ... prison officials must point to specific objective facts and rational inferences'" that establish particularized reasonable suspicion directed specifically to that visitor. *Thorne,* 765 F.2d at 1277 (quoting *Hunter,* 672 F.2d at 674). Where, as here, authorities rely on information provided by a confidential informant, the tip must possess some "indicia of reliability sufficient to give prison officials reasonable grounds to suspect drug smuggling activity" on the part of the individual searched. *Hunter,* 672 F.2d at 676. Reasonable suspicion exists only when "the information contained in the tip is linked to other objective facts known by correctional authorities." *Id.* (citing *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 [1972] ).

Defendant has cited no objective fact or rational inference implicating Anthony Varrone as a probable drug smuggler. Indeed, the general suspicions of drug trafficking at the Facility in no way implicated Joseph, Claire, or Anthony Varrone, and prison authorities discovered no evidence buttressing the informant's tip or specifically implicating plaintiff in any drug trafficking activity. Rather, prison authorities apparently subjected plaintiff to one of the most demeaning and humiliating forms of government intru-

sion on the basis of nothing more than an uncorroborated confidential informant's tip.

Although defendant urges that the strip search was required to thwart a reasonably suspected attempt by plaintiff to smuggle drugs into the Facility, several facts belie this contention. First, on March 8, 1989, five days *after* authorities had received the tip from ADA Seidel's informant, prison officials permitted Anthony Varrone and Susan Wight to visit Joseph *without first subjecting them to a search for contraband.*[3] According to Brian Malone, ADA Seidel purportedly notified DOCS authorities on March 3, 1989 of his receipt of the tip that Anthony or Claire Varrone likely would attempt to transport drugs into the Facility within the near future. (Malone Aff., ¶3.) A memorandum sent by Investigator Ramos to Gerald Wells, the Deputy Superintendent of Security at the Facility, confirms that Facility security personnel clearly were apprised of ADA Seidel's tip as early as March 6, 1989. (Malone Aff., Ex. B.) Noticeably absent, however, is any explanation for why prison personnel, admittedly armed with the information provided by ADA Seidel and faced with the directive to strip search Anthony, Claire, and "anyone that is with them" on "their next attempt to visit" Joseph (*id.*), neglected to conduct *any* search of plaintiff and his companion on March 8, 1989.

Defendant does not allege that prison authorities received corroborative information between March 8 and March 10 that could have bolstered the reliability of the tip or provided independent justification for a strip search of plaintiff on March 10. Rather, examination of the surrounding circumstances reveals that all evidence received by authorities after learning of ADA Seidel's tip actually points *away* from Joseph, Claire, and Anthony Varrone as suspects in any illegal drug trafficking at the Facility. For example, immediately after the March 8 contact visit with plaintiff, prison authorities strip-searched Joseph and then held him in isolation in a fruitless attempt to uncover secreted contraband. Similarly, authorities again failed to intercept any illicit drugs during a strip search of Claire Varrone conducted before her visit on March 9, 1989. Viewing collectively the authorities' failure to search plaintiff and his companion before their March 8 visit with the absence of any evidence of drug trafficking uncovered during previous searches of both Joseph and Claire, it appears that authorities were less justified in searching plaintiff on March 10 than they would have been prior to the March 8 visit.[4]

The issue of whether prison authorities properly were justified in subjecting plaintiff to a strip search renders inappropriate a grant of summary judgment on the basis of the present record. Indeed, as noted above, the information received by prison authorities subsequent to their learning of the tip not only failed to bolster, but actually questioned, the veracity of the information provided about the Varrones. Viewing, as it must, these facts in the light most favorable to plaintiff, the Court holds that the confidential informant's tip, absent some measure of corroboration, fails to demonstrate as a matter of law that the strip search of plaintiff was warranted. The evidence presently before the Court leaves open to question whether there existed at the time of the search independent, articulable grounds to suspect plaintiff of an attempt to smuggle drugs into the Facility, and the reasonableness of defendant's conduct thus is a question of fact best left for the jury. *See Keeler v. Hewitt,* 697 F.2d 8, 12 (1st Cir.1982) (jury properly determines the reasonableness of a

---

**3.** Whether Anthony Varrone actually visited Joseph on March 8 cannot logically be contested. Although defendant's motion papers here make no mention of the March 8, 1989 visit, this visit and the subsequent strip search and SHU confinement of Joseph Varrone formed the basis of Joseph's Section 1983 claim and were, in part, the subject of this Court's September 22, 1993 order dismissing the claims asserted by plaintiffs Joseph and Claire Varrone.

**4.** The Court draws the distinction between the knowledge possessed by security personnel on March 8 and March 10 for purposes of comparison only, and makes no finding with respect to whether any search of plaintiff would have been supported by reasonable suspicion if it had been conducted on March 8, 1989.

search in a Section 1983 action).[5]

### 3. Plaintiff Did Not Waive his Fourth Amendment Protections by Consenting to the Search

Because the Court has held that there remains a question of fact concerning the reasonableness of the strip search at issue, it becomes necessary to determine whether, as a matter of law, plaintiff's alleged consent to the search effectively waived his Fourth Amendment protections.

■ Matthews argues that Anthony Varrone cannot contest the reasonableness of the strip search because plaintiff knowingly consented to the conduct of that search. On this point Matthews bears the "burden of proving that consent was, in fact, freely and voluntarily given." *Carey,* 737 F.2d at 202 n. 23 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 [1973]). Defendant points first to a sign posted outside the Facility—which warns would-be visitors that the right of visitation may be contingent upon ·a search—as grounds for implying plaintiff's consent. More importantly, defendant relies heavily on the "Consent to Search". form plaintiff signed as evidence of an express waiver of plaintiff's Fourth Amendment rights. It is undisputed that absent his consent to the search, plaintiff would have been denied visitation privileges.

The Court finds neither of defendant's arguments persuasive. In *Cochrane v. Quattrocchi, supra,* the Court of Appeals for the First Circuit held invalid consent obtained from a prison visitor where the would-be visitor was put to the choice of either consenting to a strip search or leaving the prison. The court rejected the argument that the visitor's right to choose to decline visitation rendered her consent constitutionally

meaningful. Rather, the court concluded that "a prison visitor confronted with the choice between submitting to a strip search or foregoing a visit cannot provide a 'legally cognizable consent,' " because it " 'is the *very choice to which she was put* that is constitutionally intolerable.' " 949 F.2d at 14 (quoting *Blackburn,* 771 F.2d at 569, 568 [emphasis in original]). The Court here agrees that plaintiff "was confronted with a similar, and no less 'constitutionally intolerable,' choice between being denied prison visitation access ... or waiving [his] constitutional right to be free from [an] unreasonable search." *Id.* at 14–15. Where, as here, access to a prison is "impermissibly conditioned" on submission to a strip search, consent is constitutionally deficient as a matter of law. *Blackburn,* 771 F.2d at 567.

■ The Court also finds no merit in defendant's suggestion that the posting of the warning sign outside the Facility rendered permissible an invasion of plaintiff's privacy rights. A similar argument was advanced in *Thorne v. Jones, supra,* where the court rejected the defendant's assertion that plaintiff had consented to a strip search by executing a prison visitor form and by passing through the prison gates, at which warning notices were posted. The court cautioned that "[i]f accepted, this argument would render reasonable a strip search of any such prison visitor" irrespective of the need for the particular intrusion. 765 F.2d at 1276. Accordingly, the Court finds invalid any alleged express or implied consent to the search in question.

### 4. Matthews was Personally Involved in Conducting the Search of Plaintiff

■ Defendant Matthews correctly notes that Section 1983 liability requires a showing

---

5. The search involved here failed even to meet the standards the Department of Correctional Services sets for itself. DOCS Directive 4403, section IV.D.2., as it existed in March 1989, provides that "[i]n order to justify a strip search of a particular visitor, the Superintendent or his designee, must point to specific objective facts and rational inferences that he is entitled to draw.... In other words, [he] must have reasonable cause to believe that drugs or other contraband is concealed upon the person of the

visitor. Generalized suspicion of smuggling activity is insufficient." That section also cautions officials that *"[s]trip searches may not be ordered based on uncorroborated tips* merely stating that visitors would attempt to introduce contraband into a facility where the informant's reliability cannot be assessed and observations of visitors upon arrival at the facility do not contribute to reasonable suspicion of contraband. *Reasonable suspicion exists only if the tip can be linked to other objective facts."* (Emphasis added.)

of a defendant's personal involvement in the alleged unconstitutional behavior. *See Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). However, the Court finds wholly unconvincing defendant's attempt to distance himself from the alleged infraction involved here. While admitting that he actually performed the strip search in question, defendant Matthews argues that because he was not involved in making the *decision* to subject plaintiff to a strip search, he cannot be held liable under Section 1983. Defendant has cited no legal authority in support of this position, and the Court finds the argument meritless.

5. *Whether the Doctrine of Qualified Immunity Shields Defendant Matthews From Civil Liability Raises a Question of Material Fact*

■ The defense of qualified immunity shields government officials from civil liability " 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Prue v. City of Syracuse,* 26 F.3d 14, 17 (2d Cir.1994) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 [1982] ). Whether the doctrine of qualified immunity properly applies is a question of law to be decided by the court. *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985).

■ To establish this defense on motion for summary judgment, defendant bears the burden of showing upon undisputed facts either that it was not clear at the time he conducted the search that "the interest asserted by the plaintiff was protected by federal law," *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993), or that it was "objectively reasonable" for defendant to believe that his conduct did not violate plaintiff's clearly established rights. *Prue,* 26 F.3d at 17. When examining whether a right was clearly established at the time a defendant committed an alleged violation, the court must consider:

(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Soares v. Connecticut,* 8 F.3d 917, 922 (2d Cir.1993). *See also Calhoun v. New York State Div. of Parole Officers,* 999 F.2d 647, 654 (2d Cir.1993). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738.

■ The Court holds that in March 1989, the decisional law of the United States Supreme Court, the Court of Appeals for the Second Circuit, and the other circuit courts of appeals collectively had established that "the search of prison visitors without at least reasonable suspicion violated clearly established law." *Daugherty,* 935 F.2d at 784. As early as 1979, the Supreme Court had announced that strip searches conducted at correctional facilities—in particular strip searches of prison inmates, who logically enjoy fewer rights within a penal institution than do noninmates—must be reasonable, and that this reasonableness determination requires the court to balance "the need for the particular search against the invasion of personal rights that the search entails." *Bell,* 441 U.S. at 559, 99 S.Ct. at 1884.

The Second Circuit, elaborating upon the rule set forth in *Bell,* then defined the parameters of Fourth Amendment protection in the context of a penal institution in terms of the reasonable suspicion standard. In *Security and Law Enforcement Employees v. Carey, supra,* the court firmly established that the strip search of a corrections officer working in a correctional facility was constitutionally deficient absent reasonable suspicion. In adopting the reasonable suspicion standard, the Second Circuit relied in part on *Hunter v. Auger, supra,* a case that earlier had applied that standard to strip searches of prison visitors. In its discussion of *Hunter,*

the Second Circuit took great pains to detail the "significant parallels between visitors to correctional facilities and correction officers who work in them." 737 F.2d at 204. Then, in *United States v. Willoughby, supra,* the Second Circuit expressly recognized development of the rule that prison visitors may be subject to strip searches upon a showing of reasonable suspicion. 860 F.2d at 22 (emphasis added).

Although in March 1989 the Supreme Court and the Second Circuit had not explicitly adopted the reasonable suspicion standard in the context of a prison visitor search, existing case law addressing the "predicate requirement of reasonable suspicion for the search of prison visitors provided 'an authoritative, 'clearly established' rule forewarning'" the defendant that his actions violated plaintiff's constitutional rights. *Daugherty,* 935 F.2d at 787 (quoting *Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d 1171, 1177 [6th Cir.1988]). Indeed, each circuit court to have spoken on the issue by 1989 had declared that in order to be constitutionally sound, the strip search of a prison visitor must meet the reasonable suspicion test. *See, e.g., Smothers,* 778 F.2d 470 (Eighth Circuit); *Blackburn,* 771 F.2d 556 (First Circuit); *Thorne,* 765 F.2d 1270 (Fifth Circuit); *Hunter,* 672 F.2d 668 (Eighth Circuit).

The rules promulgated by the Department of Correctional Services bolster the conclusion that the rights asserted by plaintiff were delineated clearly at the time of the March 1989 search. *See Duamutef v. Leonardo,* 1994 WL 86700, at *10–11, 1994 U.S. Dist. LEXIS 2904 at *35–36 (N.D.N.Y. March 7, 1994). The applicable regulation in effect in March 1989, DOCS Directive 4403, section IV.D.2., expressly required corrections officers first to make a finding of reasonable suspicion based on "specific objective facts and rational inferences" before subjecting prison visitors to strip searches. *See* note 5, *supra.*

In light of the foregoing, the Court concludes that by March 1989, the law clearly established "the contours of the prison visitor's right to be free from a [strip] search in the absence of reasonable suspicion that he

or she is carrying contraband." *Daugherty,* 935 F.2d at 787. Consequently, unless defendant can demonstrate that as a matter of law it was objectively reasonable for him to believe that his actions did not violate plaintiff's rights, his qualified immunity defense must await resolution at trial.

In this respect, defendant has failed to make the showing necessary to succeed on the present motion. The doctrine of qualified immunity shields officials from suit if a reasonable official could have believed his conduct "'to be lawful, in light of clearly established law and the information [he] possessed.'" *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 [1987]). *Accord Castro v. United States,* 34 F.3d 106, 112 (2d Cir.1994). In defense of his actions, Matthews urges that it was objectively reasonable for him to follow an order he had received from his superior directing him to perform a search of Anthony Varrone before granting him entry to the Facility. Matthews correctly notes that his position required him to obey the orders of his superiors. However, defendant's position also presumably required him to follow the directives issued by the Department of Correctional Services. Here, DOCS Directive 4403 tracked the language typically employed by the courts when discussing the reasonable suspicion standard, and set forth with utmost clarity the conditions that justify the strip search of a visitor at the Facility. Defendant's proof fails to "proffer details from which ... the factual reasonableness of [his] actions would have been established," *Castro,* 34 F.3d at 112, and there remain factual questions precluding summary judgment on qualified immunity grounds.

### B. *Plaintiff's Motion to Amend*

██ Plaintiff moves to amend the complaint to name ten unidentified "John Doe" defendants and six additional known defendants, including Henrique Frett, Thomas Eisenschmidt, Gerald Wells, Juan Ramos, Thomas Mansfield, and Brian Malone.[6] Ab-

---

6. The newly-added "John Doe" defendants comprise the chain of command between Gerald

sent written consent from the adverse party, Federal Rule of Civil Procedure 15(a) requires leave of court to amend a pleading once service of a responsive pleading has been effected. While the court enjoys "considerable discretion in deciding whether to grant leave to amend, as a rule leave to amend 'shall be freely given when justice so requires.'" *New York v. Storonske Cooperage Co., Inc.,* 144 F.R.D. 179, 182 (N.D.N.Y. 1992) (quoting Fed.R.Civ.P. 15[a] ). This liberal policy advises that requests to amend be granted absent a showing of undue delay, bad faith, or dilatory tactics. *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

■ Plaintiff seeks to assert claims that indisputably are barred by the applicable statute of limitations. Rule 15(c) provides that an otherwise stale claim relates back to the original pleading if: (1) the proposed claim arises out of the conduct or transaction set forth in the original pleading; (2) each new defendant received notice of the action such that he will not be prejudiced in maintaining a defense; and (3) each new defendant "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought" against him.[7] Fed.R.Civ.P. 15(c)(2), (3). Because the claims plaintiff now seeks to add clearly arise out of the same events set forth in the original pleading, the real issue before the Court is proper notice.

Plaintiff urges that the newly-added defendants received notice of the pendency of the action through common representation by the Attorney General of the State of New York (the "Attorney General"). Plaintiff correctly notes that the courts of this Circuit have held that "when both the old and new defendants are state officials and are represented by the same lawyers ... a court is entitled to find that the new defendants received constructive notice which satisfies Federal Rule of Civil Procedure 15(c)." *Af-*

*rika v. Selsky,* 750 F.Supp. 595, 599 (S.D.N.Y.1990). Defendant Matthews and the defendants previously dismissed from the action are and were represented by the Attorney General. The Attorney General likewise would represent both the known and the "John Doe" defendants plaintiff proposes to add. The Court's inquiry cannot end here, however, because before the Attorney General's knowledge of the action can be imputed to the proposed defendants, it also is incumbent upon plaintiff to demonstrate that "the attorney(s) knew that the additional defendant[s] would be added to the existing suit." *Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir.1989). The appropriate standard by which to assess whether counsel possessed the requisite knowledge is whether he "knew or should have known" that the proposed defendants would be added. *Id.* "If counsel is on notice to prepare a defense for additional defendants, then such defendants will not be prejudiced by being named at a later date." *Felix v. New York City Police Dep't,* 811 F.Supp. 124, 128 (S.D.N.Y.1992).

The Court agrees with plaintiff that the Attorney General should have known that additional defendants would be added to the existing lawsuit. In *Hood v. City of New York,* 739 F.Supp. 196 (S.D.N.Y.1990), plaintiff inmate commenced a *pro se* action alleging Section 1983 liability against the City of New York and two corrections officers he claimed assaulted him in the Bellevue Hospital Prison Ward. Six months after counsel was appointed, plaintiff filed an amended complaint adding as defendants the Commissioner of the New York City Department of Corrections and the Commanding Officer of the Bellevue Hospital Prison Ward. The proposed defendants contested the amendment, urging that the claims asserted therein were untimely.

The court in *Hood* held that common representation by Corporation Counsel imputed to defendants knowledge of the pending suit

---

Wells, Deputy Superintendent for Security at the Facility, and defendant Matthews, the corrections officer who actually carried out the search.

**7.** Although Rule 15(c) purports to apply only to those cases wherein a party has been misnamed,

the courts of this Circuit have not limited its application to mistaken identity cases. *See Hood v. City of New York,* 739 F.Supp. 196, 198 n. 1 (S.D.N.Y.1990) (and cases cited therein).

sufficient to satisfy the notice requirements of Rule 15(c). Rejecting the contention that plaintiff intentionally excluded the proposed defendants from the original *pro se* complaint, the court stated that "Corporation Counsel should have known that the omission of [the proposed defendants] was likely due to plaintiff's lack of knowledge of the identity of the persons he alleges were responsible, not a result of a conscious tactical decision." 739 F.Supp. at 199. The court stressed that plaintiff's addition of "supervisory municipal employees"—whose identity presumably was more difficult for plaintiff to ascertain—to a suit originally naming only the city and the officers who allegedly beat plaintiff should have come as no surprise. *Id.*

Similarly, in *Hodge v. Ruperto*, 739 F.Supp. 873 (S.D.N.Y.1990), the court permitted plaintiff to amend his Section 1983 action to add several new municipal defendants. Although at the time of the amendment plaintiff was represented by counsel, plaintiff had filed the original complaint *pro se*. Like the court in *Hood*, the *Hodge* court concluded that Corporation Counsel's joint representation of several members of the New York City Police Department placed counsel and the newly-added defendants on notice that they would be added to the pending suit. The court noted that plaintiff's failure to name the new defendants in the original complaint did not appear to be the result of dilatory tactics, but rather likely was "due to plaintiff's unfamiliarity with the causes of action available to him and his lack of knowledge of the identity of the persons he alleges were responsible." 739 F.Supp. at 881.

Plaintiff's original *pro se* complaint named only defendant Bara, the Superintendent of the Facility at the relevant time, and defendant Matthews, the correction sergeant who actually performed the strip search of plaintiff. Like the plaintiffs in *Hodge* and *Hood*, Anthony Varrone apparently was ignorant of the identity of the other players involved in the alleged infraction, and accordingly named only those Facility employees he knew or believed to have participated directly in ordering and conducting the search. Because plaintiff filed his original complaint without the benefit of legal representation, the Court finds excusable his failure to sue less easily ascertainable supervisory employees. Furthermore, no prejudice will result from permitting plaintiff to amend, as the facts giving rise to the claims sought to be added mirror those asserted in the original complaint. Accordingly, the Court finds notice through shared representation sufficient to confer knowledge for Rule 15(c) purposes, and plaintiff's amendment properly relates back to the original complaint.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment hereby is DENIED, plaintiff's motion to amend the complaint hereby is GRANTED, and plaintiff hereby is directed to file with the Court an amended complaint within thirty (30) days of the date of this order.

SO ORDERED.