**Anthony VARRONE, Plaintiff–Appellee–Cross Appellant,**

*v.*

**Michael BILOTTI; Cynthia Johnson; Bert Ross; Francisco Berrios; Raymond R. Bara; John Does 1–10; Defendants,**

**John Matthews; Henrique Frett, Correction Lieutenant at Arthur Kill; Thomas Eisenschmidt, Correction Captain at Arthur Kill; Gerald A. Wells, Deputy Superintendent of Security at Arthur Kill; Juan Ramos, Inspector General's Office of the DOCS; Thomas Mansfield, Deputy Inspector General of the DOCS; Brian F. Malone, Inspector General of the DOCS; Defendants–Appellants–Cross Appellees.**

Nos. 779, 1392, Dockets 96–2368(L), 96–2382(XAP).

United States Court of Appeals, Second Circuit.

Argued Feb. 19, 1997.

Decided Aug. 18, 1997.

Kevin J. Lambeson, Assistant Attorney General, New York City (Dennis C. Vacco, Attorney General of New York, on the brief), for Defendants–Appellants–Cross Appellees.

. Thomas E. Butler, New York City (Chadbourne & Parke, Bernard W. McCarthy,

Sankar Suryananayan, New York City, on the brief), for Plaintiff–Appellee–Cross Appellant.

Before: NEWMAN, KEARSE and FRIEDMAN *, Circuit Judges.

FRIEDMAN, Circuit Judge:

I

A. In March 1989, Kings County Assistant District Attorney Eric Seidel, then Deputy Chief of the Narcotics Bureau, telephoned Brian Malone, Inspector General for the New York State Department of Correctional Services (the "Department") and told him that "he had received information from what he believed to be a reliable source that Anthony Varrone and Claire Varrone would be visiting Joseph Varrone, their father and husband, then an inmate at the Arthur Kill Correctional Facility ("Arthur Kill") in the near future and that, at such time, they would be bringing heroin into the facility." Seidel no longer remembers the source of this information, but stated that "the information either came from a person who was a confidential informant of ours or electronic surveillance," and "was reliable enough to be passed on to the Department of Corrections." Seidel did not tell Malone the source of the information, and Malone did not ask.

Upon reviewing the information in the Department's computers on Joseph Varrone, Malone learned that he was incarcerated for selling a controlled substance. Malone was aware that his office was investigating other alleged instances of drug smuggling into Arthur Kill. Malone directed his immediate subordinate, Deputy Inspector General Thomas Mansfield, to determine whether Joseph Varrone's wife or son had visited Arthur Kill on March 3, 1989. He also directed Mansfield to strip search Claire and Anthony Varrone on their next visits. Mansfield, who had no recollection about the details of what occurred, assigned the matter to Investigator Juan Ramos.

Ramos stated that, when given such a task, he would customarily conduct "some sort of background investigation." Although Ramos could not recall the details of his investigation, he remembered "at the very least" running a background check on Joseph Varrone and cross referencing all available information. Such a background check reveals the inmate's complete history, including the reason for the incarceration, as well as known co-defendants. A background check on Joseph Varrone would have disclosed that he was incarcerated for a drug-related crime, and that Anthony Varrone was a co-defendant with his father in the criminal case that resulted in Joseph Varrone's incarceration.

Ramos sent a memorandum to the Deputy Superintendent of Security at Arthur Kill, Gerald Wells, requesting that Wells ensure that any person seeking to visit Joseph Varrone submit to a strip search as a condition of visitation. Wells stated that he knew nothing about the information or its reliability, and that he "did absolutely nothing to implement the strip search order."

Wells delegated the matter to his immediate subordinate, Thomas Eisenschmidt, who had no specific memory of the strip search of Varrone. He ordered Henrique Frett, a lieutenant at Arthur Kill, to make the strip searches. Frett testified that he did not know the reason for the searches, but he directed Corrections Sergeant John Matthews to search Joseph Varrone's visitors.

Inmate Joseph Varrone was strip searched on March 8, 1989. On March 9, 1989, Claire Varrone agreed to a strip search as a condition of visiting her husband, and on March 10, 1989, Anthony Varrone similarly consented, and Matthews strip searched him. None of these searches uncovered any drugs.

B. Anthony Varrone (hereinafter "Varrone") filed a complaint in the United States District Court for the Eastern District of New York seeking damages under 42 U.S.C. § 1983 against the state officers for strip searching him. As finally amended, the complaint named as defendants the appellants Matthews, Ramos, Eisenschmidt, Wells,

* Daniel M. Friedman, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

Mansfield, Malone and Frett. Varrone's suit subsequently was consolidated with similar actions filed by Joseph Varrone and Claire Varrone, but the district court dismissed the latter claims as untimely. *Varrone v. Bilotti,* 851 F.Supp. 54 (E.D.N.Y.1993).

Matthews moved for summary judgment on the basis of qualified immunity, which the district court denied. It held that, for purposes of qualified immunity, it was clearly established at the time that strip searches of prison visitors could be made only when based upon reasonable suspicion. *Varrone v. Bilotti,* 867 F.Supp. 1145 (E.D.N.Y.1994). The court stated that a visitor's signed consent to a search, which is a condition of visitation and hence involuntary, did not constitute a waiver of Fourth Amendment rights.

Both sides then cross moved for summary judgment—the defendants on the ground of qualified immunity and the plaintiff on the ground that no reasonable trier of fact could find that the defendants' search was based on reasonable suspicion. The district court denied both motions. Noting that it had previously held that, for purposes of qualified immunity, a correctional officer must have "reasonable suspicion" before making a prison visitor submit to a strip search, the court ruled that none of the officials was entitled to qualified immunity because none had assessed whether reasonable suspicion existed to search Varrone. With respect to Frett and Matthews, the officers who conducted the search, the court stated that their actions were ministerial and ruled that qualified immunity "is not available to government employees in the discharge of ministerial tasks."

The court also denied Varrone's motion for summary judgment, stating that "[t]he inquiry into whether an official's actions were objectively reasonable and, therefore, qualifiedly immune, is separate from the determination of whether the actions resulted in a violation of a plaintiff's constitutional rights." Because of unanswered questions about the reliability of the information on which the search was based, the court concluded that genuine issues of material fact existed regarding whether the correctional officers violated Varrone's rights.

■ The correctional officers appeal from the order denying them qualified immunity. To the extent it turns solely on issues of law, such an order is immediately appealable. *See Behrens v. Pelletier,* —— U.S. ——, —— U.S. ——, ——, 116 S.Ct. 834, 841, 133 L.Ed.2d 773 (1996). Varrone cross-appeals from the denial of summary judgment in his favor, requesting this court to exercise pendent appellate jurisdiction.

II

■ A. The doctrine of qualified immunity generally provides

government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken.

*Anderson v. Creighton,* 483 U.S. 635, 638–639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987) (citations omitted). *See also Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Since qualified immunity is an affirmative defense, the defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time. *See Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982).

■ The district court here correctly stated that at the time of the strip search, under the "law of the United States Supreme Court, the Court of Appeals for the Second Circuit, and the other circuit courts of appeals," a search of prison visitors without reasonable suspicion violated clearly established law. *Varrone v. Bilotti,* 867 F.Supp. at 1153. The district court noted that although neither the Supreme Court nor this court had explicitly applied the reasonable-

suspicion standard to strip searches of prison visitors, *see id.*, "under certain circumstances, the absence of specific authority directly on point will not preclude a finding that the law was clearly established." *Shabazz v. Coughlin*, 852 F.2d 697, 701 (2d Cir. 1988). The law was "clearly established" if the circuit's decisions "clearly foreshadow" a particular ruling on the issue. *Id.* Decisions of other circuits also may indicate whether the law was clearly established. *See Weber v. Dell*, 804 F.2d 796, 803–804 (2d Cir.1986) (relying upon decisions of other circuits in making a qualified immunity determination), *cert. denied*, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).

Prior to the strip search on March 10, 1989, three other circuits had established a "reasonable suspicion" standard for strip searches of prison visitors. *See Blackburn v. Snow*, 771 F.2d 556, 569 (1st Cir.1985); *Thorne v. Jones*, 765 F.2d 1270, 1277 (5th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 313 (1986); *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir.1982). Decisions of this court also foreshadowed that standard. *See Security and Law Enforcement Employees v. Carey*, 737 F.2d 187, 205 (2d Cir.1984) (relying on *Hunter v. Auger* in applying the reasonable suspicion standard to strip searches of prison guards, by analogizing them to the prison visitors in *Hunter*). *See also Weber*, 804 F.2d at 804 (adopting the reasonable suspicion standard for strip searches of misdemeanor arrestees); *Black v. Amico*, 387 F.Supp. 88, 92 (W.D.N.Y.1974) (applying "real suspicion" test to prison visitor strip search). Accordingly, we agree with the district court that the law was clearly established that correctional officers needed reasonable suspicion to strip search prison visitors without violating their constitutional rights. The question, therefore, is whether the information the officers had when they directed and conducted the strip search of Varrone created a reasonable suspicion that he was bringing drugs into the prison.

"A 'reasonable suspicion' of wrongdoing is something stronger than a mere 'hunch,' but something weaker than probable cause." *Wood v. Clemons*, 89 F.3d 922, 929 (1st Cir.1996) (citations omitted). To establish reasonable suspicion, "prison officials must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience." *Hunter*, 672 F.2d at 674. The standard requires "individualized suspicion, specifically directed to the person who is targeted for the strip search." *Id.* at 675. In determining whether reasonable suspicion existed, the factors that may be considered include: "(1) the nature of the tip or information; (2) the reliability of the informant; (3) the degree of corroboration; and (4) other factors contributing to suspicion or lack thereof." *Security and Law Enforcement Employees*, 737 F.2d at 205.

In making that determination, it is important to keep in mind that "[t]he day-to-day problems of administering and operating correctional facilities are demanding and complex and this reality must be accorded some weight by federal courts even when confronted with constitutional challenges." *Id.; see also Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).

B. The information that Seidel gave Malone, coupled with the additional information Malone learned and had, very likely sufficed to provide reasonable suspicion that Varrone would attempt to bring drugs into Arthur Kill, and, in any event, it was objectively reasonable for Malone to believe that he was acting on the basis of reasonable suspicion which suffices to confer qualified immunity. *See Doe v. Marsh*, 105 F.3d 106, 109–10 (2d Cir.1997) (a government official is entitled to qualified immunity if it was objectively reasonable for him to believe that his actions did not violate an established right); *Wachtler v. County of Herkimer*, 35 F.3d 77, 81 (2d Cir.1994) (qualified immunity protects an official " 'if it was "objectively reasonable" for him to believe his acts were lawful' ") (quoting *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir.1990) (citation omitted)). The information was given to Malone by an assistant district attorney who was deputy chief of the narcotics bureau. The information was precise, specific and detailed. It stated that Seidel had "received information from what he believed to be a reliable source" that Varrone and his mother would be visiting

Joseph Varrone (his father and her husband) at Arthur Kill "in the near future" and that at that time they "would be bringing heroin into the facility." The information identified the smugglers by name, stated where and when they would commit the offense and specified the particular drug they would attempt to smuggle.

Upon checking the records, Malone discovered that Joseph Varrone was imprisoned for the sale of drugs. Malone also was aware that his office was investigating other alleged instances of drug smuggling into Arthur Kill.

Contrary to Varrone's contention, Malone thus did not rely solely upon a wholly uncorroborated "tip" in ordering that Varrone be strip searched the next time he visited his father at Arthur Kill. To the contrary, the specific information Malone had was sufficient to create reasonable suspicion that Varrone would attempt to smuggle heroin into Arthur Kill in the near future.

In concluding that Malone was not entitled to qualified immunity, the district court stressed that Malone himself had not made any independent investigation of the reliability of the informant or of the information Seidel had supplied. We reject any requirement that information about an impending crime cannot constitute reasonable suspicion unless the recipient of the information personally has independently investigated its reliability. The district court's requirement improperly would import into the standards governing reasonable suspicion the more stringent standards governing probable cause. As the Supreme Court has pointed out:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990).

Varrone relies upon *Daugherty v. Campbell*, 33 F.3d 554 (6th Cir.1994), to support his contention that because Malone did not independently assess or investigate the reliability of the information Seidel gave him, that information was insufficient to create reasonable suspicion. That decision, which is not binding precedent in this court, is distinguishable.

In that case a prison corrections officer told the warden (Campbell) that Lenora Daugherty was smuggling drugs on her person into the prison where her husband was an inmate, when she visited him. The warden also received two letters—one anonymous and the other bearing the signature of a non-existent person—indicating that Daugherty was smuggling drugs into the prison. Relying solely on the information the corrections officer had supplied, the warden ordered that Daugherty be strip searched prior to visiting her husband. When she was so searched, no drugs were found.

Daugherty filed suit against the warden and others under 42 U.S.C. § 1983, alleging that the strip search violated her rights under the 4th and 14th Amendments. The district court granted summary judgment for the defendants on the 14th Amendment claim, holding that they were entitled to qualified immunity, and the jury found for the defendants on the 4th Amendment claim. *Id.* at 555.

A divided Sixth Circuit reversed. The court held that the warden's "reliance on a wholly uncorroborated tip is, under the facts on this case, insufficient to constitute reasonable suspicion." *Id.* at 557. "[W]e hold, as a matter of law, in this case, where no independent objective information existed, the information upon which Campbell relied was insufficient to warrant a strip search." *Id.*

In the present case, as we have shown, Malone acted on more than "a wholly uncorroborated tip" in ordering that Varrone be strip searched. Seidel, the assistant chief of the narcotics bureau, told Malone that the information supplied came from what "he believed to be a reliable source." There is no indication that the corrections officer in *Daugherty* provided similar attestation. In addition to the information Seidel provided, Malone ascertained that Joseph Varrone was

incarcerated on a drug conviction and knew that his office was investigating other alleged instances of drug smuggling into Arthur Kill—two facts not present in *Daugherty*.

We conclude that here Malone, at a minimum, was objectively reasonable in believing that he had "'reasonable grounds for suspecting' that a search of a particular person w[ould] reveal the particular items sought." *Id.* at 560 (dissenting opinion, citation omitted). Malone's decision to order that Varrone be strip searched on his next visit to his father was protected by qualified immunity.

C. After Malone obtained the foregoing information, he instructed his immediate subordinate, Deputy Inspector General Mansfield, to strip search Varrone on his next visit to Arthur Kill. Mansfield assigned the matter to investigator Ramos, who made a background check on Joseph Varrone that would have disclosed that his son, the appellee Varrone, was a co-defendant with his father in the drug case that resulted in Joseph Varrone's imprisonment. Ramos then requested Wells, the deputy superintendent of security at Arthur Kill, to strip-search anyone seeking to visit Joseph Varrone. Wells delegated the strip-search instruction to his immediate subordinate, Eisenschmidt, who in turn delegated the order to officers Frett and Matthews, who conducted the strip search.

Except for the background check on Joseph Varrone that Ramos made, none of these officers did anything more than pass on the order to strip search Joseph Varrone's visitors and, in the case of Frett and Matthews, execute the order. None of them attempted to determine the basis for the order or the reliability of the information upon which it was based.

The district court held that the first four of these officials—Mansfield, Ramos, Wells and Eisenschmidt—were not entitled to qualified immunity because they had not independently investigated the basis for the strip search order and the reliability of the information upon which it was based; and that Frett and Matthews, who conducted the actual strip search, were not entitled to qualified immunity because they performed only a ministerial act that involved no exercise of discretion. We disagree with both rulings.

■ 1. As we hold, the information Malone possessed gave him a reasonable basis for believing that there was reasonable suspicion that Varrone would attempt to smuggle heroin into Arthur Kill when he visited his father there and gave Malone qualified immunity for his decision to direct that Varrone be strip searched. Since the four subordinate officers were merely carrying out Malone's instruction and that of their immediate superior when they ordered the strip search, they were entitled to the same immunity Malone had. There is no claim that the order was facially invalid or obviously illegal; prison strip searches are not uncommon. To require the four officers independently to investigate the basis for the apparently valid order they received, as a condition to having the same qualified immunity that the source of the order (Malone) had, would create serious problems in the administration of a prison and be detrimental to the maintenance of proper order and discipline there.

In view of the problems and realities that face prison officers, including dealing with drugs in those institutions, and the deference and discretion given those officers' day-to-day decisions relating to prison safety, security and discipline, *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878 each of these officials had qualified immunity for carrying out his supervisor's directive, even though he did not independently investigate the basis and reason for the order. *See Illinois v. Andreas,* 463 U.S. 765, 771–72 n. 5, 103 S.Ct. 3319, 3324 n. 5, 77 L.Ed.2d 1003 (1983) ("[W]here law enforcement authorities are cooperating in an investigation ... the knowledge of one is presumed shared by all."); *Whiteley v. Warden, Wyo. State Penitentiary,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1036, 28 L.Ed.2d 306 (1971) ("[P]olice officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid [had properly determined the existence of] probable cause."). *See also Wood,* 89 F.3d at 930 (superintendent of a correctional facility may rely on the investigations of other corrections officers without having to conduct an independent inquiry). Each of these four officers was protected by

qualified immunity in directing his subordinate to strip search Varrone.

■ 2. The district court held that the two officers who actually conducted the search, Frett and Matthews, did not have qualified immunity because their actions were ministerial and did not involve any exercise of discretion. The court relied on cases holding that qualified immunity covers only discretionary acts of government officials. *See, e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982). That general principle, however, cannot properly be applied here to deny those two corrections officers qualified immunity.

The continued validity of the ministerial-discretionary function distinction in determining qualified immunity has been questioned. *See Gagne v. City of Galveston,* 805 F.2d 558, 559–60 (5th Cir.1986) (the ministerial duty exception to qualified immunity is extremely narrow and police officers have such immunity for all actions performed in the course of their official duties), *cert. denied, Gagne v. Putnal,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); *Coleman v. Frantz,* 754 F.2d 719, 727 (7th Cir.1985) (noting the difficulty in applying the ministerial-discretionary distinction and stating that to determine immunity based on such a distinction "would do little to forward the purposes of immunity"). Both the Supreme Court and this court, however, have continued to articulate the distinction. *See Davis v. Scherer,* 468 U.S. 183, 194 n. 14, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984); *Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737; *Walz v. Smithtown,* 46 F.3d 162, 169 (2d Cir.1995). We need not here decide whether the distinction continues to have validity because we conclude that even if these two subordinate officers performed solely a ministerial function in conducting the strip search, they still have qualified immunity for carrying out the order, not facially invalid, issued by a superior officer who is protected by qualified immunity.

The reasons set forth in Part II(B)(1) for granting qualified immunity to the four officers are equally applicable to the two subordinate officers who conducted the strip search. Realistically, those two officers had no choice but to carry out the order they received, which was facially valid. It would be anomalous to provide qualified immunity to the higher ranking officers who ordered the strip search, but to deny it to the subordinates who carried out the order. *See Williamson v. City of Virginia Beach,* 786 F.Supp. 1238, 1260–61 n. 28 (E.D.Va.1992) (eliminating the ministerial-discretionary distinction for qualified immunity in Section 1983 actions "remedies the perverse notion that high ranking officials with discretionary and policy-making powers (and likely access to counsel) are immune from suit when similar immunity from suit is unavailable to lowly functionaries who have little, if any, choice in carrying out their ministerial functions"), *aff'd.,* 991 F.2d 793 (4th Cir.1993) (table).

Those two subordinate officers are entitled to qualified immunity for conducting the strip search of Varrone pursuant to the facially lawful order of their superior officer, even if making the search involved the performance of a ministerial function.

## III

In view of our decision that all the appellants are entitled to qualified immunity, the issue raised by Varrone's cross appeal—whether the district court should have granted him summary judgment instead of setting the case for trial—is moot. Moreover, it is doubtful whether we would have jurisdiction over the cross-appeal. *See Swint v. Chambers County Comm'n,* 514 U.S. 35, 43–51, 115 S.Ct. 1203, 1208–12, 131 L.Ed.2d 60 (1995). The cross-appeal will be dismissed.

## CONCLUSION

The order of the district court denying the defendants' motion for summary judgment based on qualified immunity is reversed, and the case is remanded to that court to dismiss the complaint on that ground. The cross appeal is dismissed as moot.