11-5403-cv
Gonzalez v. City of Schenectady

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2012

(Submitted: January 7, 2013     Decided: August 28, 2013)

Docket No. 11-5403

- - - - - - - - - - - - - - - - - - - - -x

JONATHAN GONZALEZ,

>    Plaintiff-Appellant,

>         - v.-

CITY OF SCHENECTADY; JOHN MALONEY, individually and in his capacity as an employee of the City of Schenectady, New York, Police Department; SEAN DALEY, individually and in his capacity as an employee of the City of Schenectady, New York, Police Department; ERIC PETERS, individually and in his capacity as an employee of the City of Schenectady, New York, Police Department; COUNTY OF SCHENECTADY,

>    Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - -x

Before:      JACOBS, Chief Judge, POOLER and CHIN,
             Circuit Judges.

Jonathan Gonzalez appeals from the judgment of the United States District Court for the Northern District of New York (Hurd, J.) dismissing on summary judgment Gonzalez's § 1983 complaint alleging false arrest and unlawful search.  Because there was "arguable" probable

cause to arrest Gonzalez and the law relevant to the body cavity search at issue was not clearly established, we affirm the grant of qualified immunity.  In a separate opinion, Judge Pooler concurs in part and dissents in part.

JAMES BRIAN LeBOW, LeBow and Associates, PLLC, New York, New York, for Appellant.

MICHAEL JOSEPH MURPHY, Carter, Conboy, Case, Blackmore, Maloney & Laird, P.C., Albany, New York, for Appellees.

DENNIS JACOBS, Chief Judge:

Jonathan Gonzalez brought suit against the City and County of Schenectady and three Schenectady police officers under 42 U.S.C. § 1983 and state law alleging arrest without probable cause and conduct of a visual body cavity search in violation of the Fourth Amendment.  In an area known for drug activity, Gonzalez told a confidential informant (who was wearing a wire), "What do you need?  I can get you whatever you need."  Gonzalez was arrested, taken to the police station, and subjected to a visual body cavity search.  Gonzalez was required to take off his clothes and stand against a wall, where he spread his legs and spread his buttocks.  Officers saw a protruding plastic bag, which contained crack cocaine.

Gonzalez was charged with criminal possession of a controlled substance and, after losing his suppression motion, was convicted by a jury and sentenced to two-and-a-half years' imprisonment followed by two years' post-release supervision.  The New York Supreme Court, Appellate Division, Third Department, reversed the conviction on the ground that the visual body cavity search was unlawful, relying on a New York Court of Appeals case, People v. Hall, that was decided after the search took place.

Gonzalez brought suit in the Northern District of New York, under 42 U.S.C. § 1983, alleging false arrest and unlawful search, and naming the City, the County, and the three officers involved with the search.  The district court granted summary judgment in favor of defendants on the ground of qualified immunity.  Gonzalez appeals, and for the following reasons, we affirm.

**BACKGROUND**

On May 16, 2006, the Schenectady Police Department was conducting a buy-and-bust operation using a confidential informant who was wearing a wire.  The confidential

3

informant drove to a parking lot in an area of Schenectady known as a drug mart. With him were a woman and her boyfriend Matt. The pair got out of the car while the confidential information stayed inside.

In a conversation heard by police via the wire, Gonzalez approached Matt and asked, "What's up?" Matt said he was "trying to get something." Gonzalez responded: "What do you need? I can get you whatever you need." Because the buy and bust was targeting a different dealer, the woman said, "We are all set," and Gonzalez walked away.

Officers John Maloney and Sean Daley, defendants here, had observed the encounter but did not hear the conversation. Detective Christopher Cowell, who had listened in, radioed to tell them that Gonzalez had just attempted to sell drugs. Gonzalez then walked to the bus station to buy a ticket to the Bronx to visit his mother. At the bus station, two other officers--Robert Dashnow and defendant Eric Peters--approached Gonzalez with guns drawn, told him to get on the ground outside the station, and searched him. After finding nothing, they placed him in a van, and Officer Daley began to question him and search him again.

4

At the police station, Officers Peters and Maloney elicited Gonzalez's background information, and then told him to take his clothes off. When Gonzalez was undressed, Officer Maloney instructed him to stand against the wall, spread his legs, and spread his buttocks so they could see inside. The officers observed a "little plastic bag sticking out . . . of [his] rectum." Gonzalez alleges that one of the officers then "put his fingers in [Gonzalez's] rectum penetrating [his] rectum" and removed a bag containing drugs. He claims that this (as opposed to the storage) caused him to bleed for approximately a year afterwards. Defendants assert that Gonzalez pulled it out himself.

Gonzalez was charged with criminal possession of a controlled substance. The trial court denied his motion to suppress the drugs found in the search, focusing almost exclusively on whether there was probable cause to arrest Gonzalez, and concluding that there was. The court made only a passing remark about the legality of the search itself: "Subsequent to [Gonzalez's] arrest, a lawfully conducted strip search did in fact reveal that [he] possessed cocaine."

5

A jury convicted Gonzalez of Criminal Possession of a Controlled Substance in the Third Degree and Criminal Possession of a Controlled Substance in the Fourth Degree, and he was sentenced to two-and-a-half years' imprisonment and two years' post-release supervision.

On December 24, 2008, the New York Supreme Court, Appellate Division, Third Department, reversed the conviction, concluding that "there was no specific, articulable factual basis supporting a reasonable suspicion for conducting the visual cavity inspection here. . . . [A]nd the evidence related to the inspection should have been suppressed."  People v. Gonzalez, 57 A.D.3d 1220, 1222 (3d Dep't 2008).  The Third Department cited People v. Hall, 10 N.Y.3d 303 (2008), in support of its conclusion that the police needed reasonable suspicion that they would find contraband in Gonzalez's body cavity.

Gonzalez filed a summons in New York Supreme Court on July 27, 2009, against the City of Schenectady, the County of Schenectady, and Officers Maloney, Daley, and Peters under 42 U.S.C. § 1983, arguing that the arrest and visual body cavity search violated Gonzalez's Fourth Amendment

right to be free from unreasonable searches and seizures.[1] Defendants removed the case to the Northern District of New York (Hurd, J.).  The district court dismissed the case on summary judgment in November 2011, concluding that the officers were entitled to qualified immunity for the arrest because there was "arguable probable cause."  It also concluded that they were entitled to qualified immunity for the search because the law on body cavity searches was not clearly established when the search occurred, Hall having been decided (in 2008) two years after the search.  The claims against the City and County were dismissed because Gonzalez alleged only vicarious liability.[2]

## DISCUSSION

The Court reviews de novo a decision on a motion for summary judgment.  Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 763 (2d Cir. 2002); see also Miller v. Wolpoff &

---

[1]  Gonzalez also alleged state law claims for negligent infliction of emotional distress, negligence, intentional infliction of emotional distress, malicious prosecution, and false imprisonment.  He withdrew all of these except the malicious prosecution and false imprisonment claims before the district court decided the summary judgment motion.

[2]  Gonzalez does not appeal the dismissal of the claims against the City and County.

7

Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003).  Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Miller, 321 F.3d at 300.  In assessing a motion for summary judgment, a Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment [was granted]."  Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003) (internal quotation marks omitted).

**I**

The doctrine of qualified immunity protects government officials from suit if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The issues on qualified immunity are: (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was "clearly established"; and (3) even if the right was "clearly established," whether it was "objectively reasonable" for the officer to believe the

8

conduct at issue was lawful.  Taravella v. Town of Wolcott, 599 F.3d 129, 133-34 (2d Cir. 2010).

To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  In this way, qualified immunity shields official conduct that is "'objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.'" X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 66 (2d Cir. 1999) (alterations omitted) (quoting Anderson, 483 U.S. at 639); see also Taravella, 599 F.3d at 134-35.

**II**

A § 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law. Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).  "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." Id. (internal quotation marks omitted); see also Broughton v. State, 37 N.Y.2d 451, 456-58 (1975).

**A**

The first question as to qualified immunity is whether the officers violated Gonzalez's rights by arresting him. That is, whether the officers had probable cause to arrest him at the time of the arrest. "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested *has committed or is committing a crime*." Weyant, 101 F.3d at 852 (emphasis added). The inquiry is limited to "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006).

To ascertain the existence of probable cause, we look at the facts as the officers knew them in light of the specific elements of each crime. While an officer "need not have concrete proof of each element of a crime to establish probable cause for an arrest," Brewton v. City of New York, 550 F. Supp. 2d 355, 365 (E.D.N.Y. 2008), probable cause means "more than bare suspicion," Brinegar v. United States, 338 U.S. 160, 175 (1949). And it certainly means more than

10

suspicion of some generalized misconduct: "no probable cause exists to arrest where a suspect's actions are too ambiguous to raise more than a generalized suspicion of involvement in criminal activity." United States v. Valentine, 539 F.3d 88, 94 (2d Cir. 2008).

The only facts known to the officers at the time of the arrest were that (1) Gonzalez was in an area known for drug sales, and (2) Gonzalez approached Matt and offered to get him "whatever [he] need[ed]."[3] The question is whether these circumstances supported probable cause to arrest Gonzalez for criminal possession of a controlled substance, or for criminal sale of a controlled substance, or for an attempt.

**1**

Gonzalez was convicted of Criminal Possession of a Controlled Substance in the Third and Fourth Degrees. A person is guilty of Criminal Possession of a Controlled Substance in the Third Degree "when he knowingly and unlawfully possesses . . . a narcotic drug with intent to

---

[3] "[W]here . . . an arresting officer has acted on the basis of a radio communication from a fellow officer who has personal knowledge of the facts transmitted, he or she presumptively possesses the requisite probable cause." People v. Pacer, 203 A.D.2d 652, 653 (3d Dep't 1994).

11

sell it." N.Y. Penal Law § 220.16(1). A person is guilty of Criminal Possession of a Controlled Substance in the Fourth Degree "when he knowingly and unlawfully possesses . . . one or more preparations, compounds, mixtures or substances containing a narcotic drug . . . [with] an aggregate weight of one-eighth ounce or more." Id. § 220.09(1)

The most natural meaning of Gonzalez's statement (that he could get Matt "whatever [he] need[ed]") is that Gonzalez possessed no controlled substance at the moment, and that if Matt needed some, Gonzalez would have to "get" it. The statement did not preclude the possibility that Gonzalez was keeping drugs in a body cavity, since it would not be expected that he would retrieve it for delivery then and there; but neither did the statement indicate that he had on his person whatever drug Matt might name.

The officers never saw Gonzalez make a transaction, nor did they see anything showing that Gonzalez possessed drugs, as opposed to simply knowing where to get them. Cf. People v. Eldridge, 103 A.D.2d 470, 471-72 (1st Dep't 1984) (overturning finding of no probable cause where officers observed defendant with glassine envelopes containing a white substance in a high drug area).

12

Even without probable cause to believe Gonzalez *possessed* drugs, the officers might have had probable cause to arrest Gonzalez for Criminal Sale of a Controlled Substance, which requires a defendant to have "knowingly and unlawfully [sold] . . . a narcotic drug."  N.Y. Penal Law § 220.39.  Under New York Penal Law § 220.00, "'[s]ell' means to sell, exchange, give or dispose of to another, *or to offer or agree to do the same*."  (Emphasis added).  The New York Court of Appeals has held that, "in order to support a conviction under an offering for sale theory, there must be evidence of a bona fide offer to sell--i.e., that defendant had both the intent and the ability to proceed with the sale."  People v. Mike, 92 N.Y.2d 996, 998 (1998); see also People v. Crampton, 45 A.D.3d 1180, 1181 (3d Dep't 2007).

The Mike case is instructive:

> Defendant approached two off-duty police officers and inquired whether they were interested in purchasing an unspecified type and quantity of drugs.  One of the officers asked if defendant had any "dime bags;" [sic] defendant responded that he only had "twenties."  Ultimately, defendant got into the officers' vehicle and led them to the driveway of a building.  Defendant told the officers to give him some money, and he would go into the building and get the drugs.  The officer

13

> who had offered to purchase the drugs was unwilling to go along with this arrangement. The money belonged to the officer and he was admittedly afraid that defendant would simply abscond with it.  Because of the officer's unwillingness to either part with the money or accompany defendant into the building, the transaction proceeded no further and without ever having exited the vehicle, defendant was placed under arrest for offering to sell drugs.

Mike, 92 N.Y.2d at 998.  The Court of Appeals held that the evidence in that case "was insufficient to establish that defendant had the ability to carry out the sale."  Id. at 999; see also People v. Braithwaite, 162 Misc. 2d 613, 614-16 (N.Y. Sup. Ct. 1994) (finding that the evidence was insufficient to support a conviction for Criminal Sale of a Controlled Substance because "[t]he offer here was anything but definite. It was couched in terms such as 'if I can get'; 'you want like an ounce or so'; 'you willing to spend like $800'; 'once I get the price'; and 'you know how long I don't buy a ounce.'").

Gonzalez did not "offer" to sell drugs to Matt because what Gonzalez said was considerably short of a "bona fide" offer.  Cf. People v. Rodriguez, 184 A.D.2d 439, 439 (1st Dep't 1992) (concluding that an offer to sell cocaine, followed by an undercover officer "asking for 'two'" and the defendant reaching for a cigarette box containing the

14

cocaine, was sufficient).  Once Gonzalez walked away from Matt, there was no reason to believe that he had made a bona fide offer.

There was therefore no probable cause to arrest Gonzalez for Criminal Sale of a Controlled Substance.

**3**

The officers might have also had probable cause to arrest Gonzalez for attempting either one of these two crimes.  "A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime."  N.Y. Penal Law § 110.00.  For an attempt, it must be shown that the defendant "committed an act or acts that carried the project forward within dangerous proximity to the criminal end to be attained."  People v. Warren, 66 N.Y.2d 831, 832–33 (1985) (citing People v Di Stefano, 38 N.Y.2d 640, 652 (1976)).  A defendant cannot be convicted for Attempted Criminal Sale of a Controlled Substance if "several contingencies [stand] between the agreement . . . and the contemplated purchase."  Warren, 66 N.Y.2d at 833.  The court arrived at that result in Warren notwithstanding that the defendant had met with an undercover officer and

15

discussed the quality, quantity, and price of the cocaine purchase that was to take place later. Id. at 832.

As in Warren, "several contingencies [stand] between" Gonzalez's off-the-cuff statement and a sale of drugs. The officers therefore lacked probable cause to believe that Gonzalez had attempted to commit either crime.

**B**

The right to be free from arrest without probable cause was clearly established at the time of Gonzalez's arrest. See Jenkins v. City of New York, 478 F.3d 76, 86-87 (2d Cir. 2007). Gonzalez's false arrest claim therefore turns on whether the officers' probable cause determination was objectively reasonable. See id. "An officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of the arrest--that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" Id. (quoting Lennon v. Miller, 66 F.3d 416, 423-24 (2d Cir. 1995)). However, "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause. . . . If officers of reasonable competence would have to agree that the information possessed by the officer at the time of

16

arrest did not add up to probable cause, the fact that it came close does not immunize the officer."  Id.

The analysis of probable cause set out above entails a careful parsing of Gonzalez's statement and a close examination of the elements of a number of different criminal statutes.  Officers charged with making moment-by-moment decisions cannot be expected to undertake such a project.  While Gonzalez's statement on its own does not satisfy the elements of any crime, he was in an area known for drug sales and he said it to a person obviously trawling for drugs.  (The police could intuit that Matt and Gonzalez were not talking about prostitutes, absinthe, or Cuban cigars.)  Significantly, the experienced state trial judge conscientiously analyzed the probable cause question during the criminal proceeding and concluded that there was indeed probable cause to arrest Gonzalez.

We therefore conclude that there was "arguable" probable cause and that the officers are entitled to qualified immunity for Gonzalez's false arrest claim under § 1983.[4]

---

[4]    This conclusion also disposes of Gonzalez's state law false imprisonment claim against the officers because "New York Law . . . grant[s] government officials qualified immunity on state-law claims except where the officials'

17

**III**

The search of Gonzalez at the station raises a question as to Gonzalez's Fourth Amendment right to be free from unreasonable searches.  It is useful to define terms before proceeding to analysis: (1) a "strip search" occurs when a suspect is required to remove his clothes; (2) a "visual body cavity search" is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); (3) a "manual body cavity search" occurs when the police put anything into a suspect's body cavity, or take anything out.  See People v. Hall, 10 N.Y.3d 303, 306-07 (2008).

**A**

The law governing these types of searches is far from settled; the rules alter with circumstances, and the circumstances are myriad.  The key precedents turn kaleidoscopically on whether the arrest is for a felony or a misdemeanor, and whether the suspect is placed in the general prison population, among other considerations.

---

actions are undertaken in bad faith or without a reasonable basis."  Jones v. Parmley, 465 F.3d 46, 63 (2d Cir. 2006); see also Blouin ex rel. Estate of Pouliot v. Spitzer, 356 F.3d 348, 364 (2d Cir. 2004).

In Schmerber v. California, 384 U.S. 757 (1966), the suspect was hospitalized following a car accident. Id. at 758. A policeman at the scene smelled alcohol on the suspect's breath, and inferred from that and other observations that the suspect was drunk. Id. at 768-69. At the hospital, the officer made the arrest and instructed a doctor to take a blood sample. Id. at 758. The Supreme Court first held that there was probable cause for arrest and for a search incident to arrest. Id. at 769. However, the Court held that the search-incident-to-arrest doctrine alone did not justify the drawing of the suspect's blood; the police needed "a clear indication that in fact such evidence will be found." Id. at 669-70. No warrant was required, though, because of the exigent circumstance that the blood-alcohol concentration would soon dissipate. Id.

In Bell v. Wolfish, 441 U.S. 520 (1979), the Supreme Court was asked to decide whether a blanket policy requiring visual body cavity searches for all pretrial detainees being housed in a correctional facility who had seen visitors was constitutional. Citing Schmerber, the Court held that the constitutionality of this scheme depended on "[1] the scope of the particular intrusion, [2] the manner in which it is

19

conducted, [3] the justification for initiating it, and [4] the place in which it is conducted." Id. at 559. The Court concluded that the scheme was reasonable because "[a] detention facility is a unique place fraught with serious security dangers." Id.

In 1986, we held in Weber v. Dell

> that the Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with *misdemeanors or other minor offenses* unless the officials have a *reasonable suspicion* that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest.

804 F.2d 796, 802 (2d Cir. 1986) (emphases added). In Weber, the suspect was placed in a vacant cell, decreasing the concerns regarding jailhouse safety. Id. at 799.

This rule was later applied in Shain v. Ellison, 273 F.3d 56 (2d Cir. 2001). The plaintiff had been arrested for first degree harassment, a misdemeanor. Id. at 60. Relying on Weber, we held that "it was clearly established in 1995 that persons charged with a misdemeanor and remanded to a local correctional facility . . . have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons." Id. at 66.

20

Prior to the search at issue here, Judge McMahon of the Southern District of New York had decided a number of cases that expanded Weber to arrests for drug-related felonies. In Sarnicola v. County of Westchester, Judge McMahon held that "particularized reasonable suspicion" was required to strip search all suspects, whether they were arrested for misdemeanors or felonies. 229 F. Supp. 2d 259, 270 (S.D.N.Y. 2002). She observed that "[a]n automatic justification for strip searches based on an arrest for a drug-related crime would be inconsistent with the legal concept of reasonable suspicion based on the *totality* of the circumstances." Id. at 273-74. She ruled to the same effect in Bradley v. Village of Greenwood lake, 376 F. Supp. 2d 528 (S.D.N.Y. 2005); Bolden v. Village of Monticello, 344 F. Supp. 2d 407 (S.D.N.Y. 2004); and Murcia v. County of Orange, 226 F. Supp. 2d 489 (S.D.N.Y. 2002). In so holding, Judge McMahon noted that "the Second Circuit has not spoken directly to the appropriate test for the validity of a strip search incident to a felony arrest." Sarnicola, 229 F. Supp. 2d at 270; accord Murcia, 226 F. Supp. 2d at 494.

In 2008, the New York Court of Appeals decided People v. Hall, 10 N.Y.3d 303 (2008). In Hall, police observed

21

Hall on a street corner repeatedly receive money from someone, go into a nearby bodega, and return a few minutes later with drugs to hand to the customer. Id. at 305-06. The officers arrested him and strip-searched him at the station prior to placing him with any other prisoners. Id. When the officers told him to bend over, they saw a string coming out of his rectum. Id. When Hall refused to remove it, the officers removed it themselves and found that it was attached to a bag of crack cocaine. Id.

The Hall court began by defining the terminology outlined at the beginning of this Section. It then held as follows:

> Summarizing the relevant constitutional precedent, it is clear that a [1] strip search must be founded on a reasonable suspicion that the arrestee is concealing evidence underneath clothing and the search must be conducted in a reasonable manner. To advance to the next level required for a [2] visual cavity inspection, the police must have a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity and the visual inspection must be conducted reasonably. If an object is visually detected or other information provides probable cause that an object is hidden inside the arrestee's body, [3] Schmerber dictates that a warrant be obtained before conducting a body cavity search unless an emergency situation exists. Under our decision in More, the removal of an object protruding from a body cavity, regardless of whether any insertion into the body cavity is necessary, is subject to

22

the Schmerber rule and cannot be accomplished without a warrant unless exigent circumstances reasonably prevent the police from seeking prior judicial authorization.

Id. at 310-11. The court went on to say, "Our precedent on this point is unequivocal: the police are required to have 'specific and articulable facts which, along with any logical deductions, reasonably prompted th[e] intrusion.'" Id. at 311 (alteration in original) (quoting People v. Cantor, 36 N.Y.2d 106, 113 (1975)). However, no case cited by the Hall court said that an officer needs particular, individualized facts to conduct a visual body cavity search.

In Florence v. Board of Chosen Freeholders of County of Burlington, 132 S. Ct. 1510 (2012), the Supreme Court again confronted the issue of general prison strip search policies. In Florence, a mistake in a computer system led police to believe that there was an outstanding warrant for the plaintiff's arrest. Id. at 1514. He was pulled over and arrested pursuant to that warrant. Id. In jail, officials performed a visual body cavity search under a blanket policy. Id. The Supreme Court, building on Bell v. Wolfish, held that a blanket policy of conducting visual body cavity searches on new inmates was constitutional, even for misdemeanor arrestees where there is no reason to

23

suspect that the arrestee would have contraband. Id. at 1520-21.

The plaintiff in Florence was placed in a general prison population. The Court noted, "This case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees." Id. at 1522.

**B**

The officers do not dispute that the search violated Gonzalez's right to be free from unreasonable searches; their position is that the right violated was not clearly established. We need not determine whether the facts alleged make out a violation of a constitutional right prior to determining whether that right was clearly established. See Pearson v. Callahan, 555 U.S. 223, 236 (2009) (dispensing with the rule announced in Saucier v. Katz, 533 U.S. 194 (2001), that required courts to first determine whether there was a constitutional violation before proceeding to the qualified immunity analysis). This is especially true here, where the issue was not fully briefed

24

by the government.  Id. at 225 (cautioning that courts should not rule on constitutional issues where "the briefing of constitutional questions is woefully inadequate").

**C**

Defendants-Appellees are not liable under § 1983 unless the right at issue was clearly established, meaning that "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In deciding whether a right was clearly established, we ask: (1) Was the law defined with reasonable clarity? (2) Had the Supreme Court or the Second Circuit affirmed the rule? and (3) Would a reasonable defendant have understood from the existing law that the conduct was unlawful?"  Young v. Cnty. of Fulton, 160 F.3d 899, 903 (2d Cir. 1998).  The answer to all three is no.

At the time of the search, we had never held that the Fourth Amendment is violated by a suspicionless search (strip search or visual body cavity search) of a person arrested for felony drug possession.  Although we have repeatedly held that the police may not conduct a suspicionless strip or body cavity search of a person

arrested for a misdemeanor, reasonable officers could disagree as to whether that rule applied to those arrested for felony drug crimes, given the propensity of drug dealers to conceal contraband in their body cavities.  See, e.g., Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1273 (7th Cir. 1983) (describing "narcotics violations" as one of the "kinds of crimes, unlike traffic or other minor offenses, that might give rise to a reasonable belief that the . . . arrestee was concealing an item in a body cavity").  Judge McMahon (who seems to have had a full share of these cases) has repeatedly emphasized that we have never applied the rule from Weber and Shain to searches of suspects arrested for felony drug crimes.  See Sarnicola v. Cnty. of Westchester, 229 F. Supp. 2d 259, 270 (S.D.N.Y. 2002); Murcia v. Cnty. of Orange, 226 F. Supp. 2d 489, 494 (S.D.N.Y. 2002).

The New York Court of Appeals' decision in People v. Hall, 10 N.Y.3d 303 (2008), does not support the view that the search of Gonzalez violated a clearly established federal constitutional rule.  Hall was decided after the search at issue in this case.  It is not a ruling of the Supreme Court or this Court.  And though the wording in Hall

26

seems promising for Gonzalez--"[o]ur precedent on this point is *unequivocal*: the police are required to have 'specific and articulable facts which, along with any logical deductions, reasonably prompted th[e] intrusion,'" <u>id.</u> at 311 (emphasis added) (alteration in original) (quoting <u>People v. Cantor</u>, 36 N.Y.2d 106, 113 (1975))--not one case cited in <u>Hall</u> said that an officer needs particular, individualized facts to conduct a visual body cavity search.[5]

Shain v. Ellison is similarly distinguishable: the arrest was for first degree harassment, a misdemeanor. 273 F.3d 56, 60 (2d Cir. 2001). A reasonable officer who made a study of these ramified precedents could distinguish arrests for offenses such as harassment from arrests for felonies-- especially felonies involving drugs. In any event, <u>Shain</u> is likely no longer good law in light of <u>Florence v. Board of Chose Freeholders of County of Burlington</u>, 132 S. Ct. 1510, 1515 (2012), which held that misdemeanor arrestees could be

---

[5] <u>Cantor</u>, the case relied upon in <u>Hall</u> for this proposition, does not mention the words "strip search" or "body cavity search." The rule in <u>Hall</u> was characterized as a "pronouncement" by the trial court in <u>People v. Crespo</u>, reflecting its novelty. 29 Misc. 3d 1203(A), at *8 (N.Y. Sup. Ct. 2010).

subject to visual body cavity searches before being placed in the general prison population, as the plaintiff in <u>Shain</u> was. <u>Shain</u>, 273 F.3d at 60, 65-66.

While we can expect police officers to be familiar with black-letter law applicable to commonly encountered situations, they cannot be subjected to personal liability under § 1983 based on anything less. There are so many permutations of fact that bear upon the constitutional issues of a search: the arrest can be for a misdemeanor or a felony, for a drug offense or not; the search can be a strip search, a visual body cavity search, or a manual one; the person arrested can be headed to the general prison population or a single cell; the place of the search can be private or less than private; the impetus for the search can be a tip, or the policeman's observations or experience or hunch, or the neighborhood, or a description, or some or all of the above; and other considerations as well. The policeman is not expected to know all of our precedents or those of the Supreme Court, or to distinguish holding from dicta, or to put together precedents for line-drawing, or to discern trends or follow doctrinal trajectories. Otherwise, qualified immunity would be available only to a cop who is a

28

professor of criminal procedure in her spare time.  The police cannot be expected to know such things at risk of *personal liability* for the policeman's savings, home equity, and college funds.  And such personal liability is the only kind of liability imposed by § 1983 (absent a <u>Monell</u> claim). That tells us something about the threshold of liability in these cases.[6]

We conclude that a reasonable officer--even one familiar with the cases described above--would not have understood that conducting an otherwise suspicionless visual body cavity search of a person arrested for a felony drug offense was unlawful; the defendants in this case are therefore entitled to qualified immunity.[7]

---

[6]    The premise--that a suit against an individual government employee is in substance a suit against his employer--is wrong. Doubtless in some political subdivisions of this Circuit the government supplies defense counsel and pays the judgment if an officer is personally liable under § 1983.  But this Circuit includes scores of counties and hundreds of towns and municipalities; and there are thousands of political subdivisions in the nation. Not all of them will indemnify their employees for § 1983 judgments; many cannot even afford to furnish a defense; some can barely keep the school open.

[7]    Gonzalez also alleges that the defendants violated his Fourth Amendment rights when they conducted a manual body cavity search and pulled the bag of crack cocaine out of Gonzalez's anus.  Who pulled the bag out is disputed, but even assuming it was the officers, they would not have violated clearly established law by doing so; once they saw

**IV**

Gonzalez also claims malicious prosecution under § 1983. A § 1983 claim for malicious prosecution looks to the relevant state common law. See Janetka v. Dabe, 892 F.2d 187, 189 (2d Cir. 1989). Under New York law, a plaintiff must show that the underlying proceeding was terminated in his favor to make out a malicious prosecution claim. See id. at 189. "Where the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused, for these purposes, only when its final disposition is such as to indicate the innocence of the accused." Murphy v. Lynn, 118 F.3d 938, 948 (2d Cir. 1997).

Here, the officers found crack cocaine in Gonzalez's rectum, eliminating any doubt that Gonzalez was, in fact, guilty of at least criminal possession of a controlled substance. His malicious prosecution claim therefore fails.

---

the bag protruding from Gonzalez's anus, they had probable cause to search him for it, and we have never held that such a search requires a warrant. Cf. Hall, 10 N.Y. 3d at 310-11.

30

**CONCLUSION**

For the foregoing reasons, the judgment of the district court dismissing all of Gonzalez's claims against the officers in their individual capacities is AFFIRMED.

POOLER, *Circuit Judge*, dissenting:

I concur in the majority opinion in its statements of controlling law and its conclusions as to Part I, II,[1] and IV. I respectfully dissent however, as to Part III, because I believe that the relevant rule regarding body cavity searches was clearly established, as it was clearly foreshadowed as a federal constitutional right, prior to Gonzalez's arrest.

---

[1] Although I agree with the majority's conclusion in Part II, that arguable probable cause exists in this instance, I must stress: this is a close case. Arguable probable cause exists where "officers of reasonable competence could disagree on the legality of [their] action [in this] particular factual context." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (internal quotation marks omitted). Where the "*only* facts known to the officers at the time of the arrest," were that (1) the location was known for drug sales and (2) Gonzalez said he *could* get drugs, *see* Maj. Op. at 11 (emphasis added), the question of arguable probable cause is indeed a close question. If the officers had not been able to rely on the second factor, that Gonzalez said he could get drugs, officers of reasonable competence could not disagree on the illegality of their action.

Officers must rely on something more than the location's reputation in order to find reasonable suspicion. *See Holeman v. City of New London*, 425 F.3d 184, 190 (2d Cir. 2005) (stating that driving in circuitous route in high-crime area at 4:30 a.m. not enough, standing alone, to support reasonable suspicion); *United States v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006) ("Reasonable suspicion requires considerably less of a showing than probable cause."). If a location's reputation as a "high crime area" is not enough to advance reasonable suspicion, a location's reputation as a "high drug area" certainly cannot be enough to suggest probable cause, without more information. Although officers are allowed to take a location's reputation into consideration, *see United States v. Muhammad*, 463 F.3d 115, 122-23 (2d Cir. 2006), it must be coupled with some other indication, such as flight from the scene, *see id.*, or the prevalence of drug sales at a *particular address* in order to conclude that arguable probable cause existed. *See Martinez v. City of Schenectady*, 115 F.3d 111 (2d Cir. 1997) (concluding probable cause existed where officers previously knew about drug sales from plaintiff's specific apartment address).

In this case, the general location's prevalence in drug sales can therefore not be enough to create arguable probable cause or else all residents who live in high drug or high crime areas would be vulnerable to arbitrary arrest. Nonetheless, I agree that we may conclude arguable probable cause existed in this instance because the officers in this case could couple the location's reputation with Gonzalez's statement.

1

**I.**

To determine whether a right was clearly established[2] we look to "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Shechter v. Comptroller of City of N.Y.*, 79 F.3d 265, 271 (2d Cir. 1996) (internal quotation marks omitted). "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

---

[2] In resolving the question of qualified immunity, a court must decide whether the alleged conduct was a violation of a constitutional right and whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Here, no one disputes that the search violated Gonzalez's right to be free from unreasonable searches; the defendant's position is only that the right violated was not clearly established. After Gonzalez was arrested he was told to get on the floor and was searched, but the pat down yielded nothing. Plaintiff was handcuffed and taken to police headquarters, where police conducted a full cavity search. Officers stated that Gonzalez was subjected to this search only because he was arrested on a narcotics offense. According to the Schenectady Police Department's policy, police required Gonzalez to undress completely, turn around, put his hands on the wall, spread his feet, and use his hands to spread his buttocks. Before taking off his boxers, officers had not identified any contraband. Only after spreading his buttocks, officers located and removed a bag with drugs. The parties disagree as to whether the officers or Gonzalez removed the bag.

This is not to say that an action is clearly established only if the court has explicitly held that the behavior is unlawful. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). We have repeatedly held a law is considered clearly established if decisions of the Supreme Court or this Court "*clearly foreshadow* a particular ruling on the issue." *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997) (internal quotation marks omitted) (emphasis added). *See also id.* at 79 (quoting *Shabazz v. Coughlin*, 852 F.2d 697, 701 (2d Cir. 1988) (stating in "the absence of a specific authority directly on point" we look to whether this Circuit or the Supreme Court had presaged the particular ruling). We have taken special care to apply this "clearly foreshadowed" standard in the context of the Fourth Amendment, *see Varrone*, 123 F.3d at 78; *see also Shabazz*, 852 F.2d at 701, which "is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

## II.

Here, the relevant question is whether the heightened standard for an anal body cavity search of a felony arrestee was clearly foreshadowed by this Circuit or the Supreme Court, at the time of Gonzalez's search in 2006.[3] The New York State Appellate Division initially found that the officer's had not met the heightened reasonable suspicion standard to justify Gonzalez's visual cavity search, indicating that the Appellate

---

[3] The majority states that the question here regards a strip search or visual body cavity search. According to the Appellees, Gonzalez himself removed the bag from his buttocks. According to the Gonzalez, one of the officers removed the bag from his buttocks.

3

Division believed the rule was clearly established. *People v. Gonzalez*, 57 A.D.3d 1220, 1222 (N.Y. App. Div. 2008). The district court concluded differently, stating that the law requiring a more stringent standard for body cavity searches had not been clearly established until *People v. Hall*, 10 N.Y.3d 303, 310-11 (2008) subsequent to Gonzalez's arrest. *Gonzalez v. City of Schenectady*, No. 09-cv-1434,2011 WL 6010910, at *4 (N.D.N.Y. Nov. 30, 2011). The majority agrees with the district court, to the extent that it states, "[t]he law governing these types of searches is far from settled; the rules alter with circumstances, and the circumstances are myriad." However, the majority fails to apply the correct test. Regardless of whether the Supreme Court or this Circuit directly held this rule, it was undoubtedly foreshadowed previous to Gonzalez's arrest, thus, I must disagree with the majority's conclusion in Part III.

Both the Supreme Court and this Circuit have held that police searches within the body require a special heightened standard. In *Schmerber v. California*, 384 U.S. 757 (1966), the Supreme Court held that intrusions beyond the body's surface are forbidden by the Fourth Amendment in the absence of clear indication that the evidence will be found. *Id.* at 770. In that case, the Court held that probable cause to search a drunk driver did not justify the more intrusive drawing of the suspect's blood. *Id.* "[I]nterests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained." *Id.* at 769-70. *See also Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 613-14 (1989) ("The [Fourth] Amendment guarantees the privacy, dignity, and security of persons against certain

4

arbitrary and invasive acts by officers of the Government or those acting at their direction.") Thus, "[i]n the absence of a clear indication[4] that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search." *Schmerber*, 384 U.S. at 770.

In *Bell*, 441 U.S. 520, the Supreme Court extended this rule to body cavity searches. There, the Court held that policies requiring pretrial detainees be given visual body cavity searches after having seen a visitor may be constitutional. *Id.* at 560. However, *Bell* still recognized pretrial detainees retain some Fourth Amendment rights. *Id.* at 558; *see also id.* at 545 ("we have held that convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison"). Vigilant of these privacy interests and *Schmerber*, the Court concluded these "searches must [still] be conducted in a reasonable manner." *Id.* at 560 (citing *Schmerber*, 384 U.S. at 771-72). The test for reasonableness requires courts to consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559.[5]

---

[4] The Court clarified a "clear indication" to mean "the necessity for particularized suspicion that the evidence sought might be found within the body of the individual." *United States v. Montoya De Hernandez*, 473 U.S. 531, 540 (1985).

[5] The Court in *Bell* did not speak to the issue of whether arrestees were subject to the same standard.

5

Following *Bell*, this Circuit and others were wary to uphold body cavity searches as constitutional, under the test for reasonableness. The Circuits hesitated, stating that such searches are invasive and degrading. *See Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983) (recognizing "strip searches involving the visual inspection of the anal and genital areas as 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission'"); *see also Arruda v. Fair*, 710 F.2d 886, 887 (1st Cir. 1983). In fact, the Supreme Court agreed with this depiction, stating that body cavity searches were the "most intrusive" of all searches. *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 672 (1995). As stated in a related Fourth Amendment case, the general consensus was that, "[s]uch an invasion of bodily integrity implicates an individual's most personal and deep-rooted expectations of privacy." *Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013) (internal quotation marks omitted).

Thus, for over two decades, this Circuit understood that cavity searches for misdemeanants would be unjustified unless they satisfied the heightened standard. *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986). In *Weber*, we stated that the Supreme Court had not "read out of the Constitution the provision of general application that a search be justified as reasonable under the circumstances." *Id.* at 800. Nor had it "free[d] prison officials from all Fourth Amendment constraints." *Id.* Thus, we held that a strip search of a misdemeanor arrestee is unlawful unless there is "reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the

6

particular characteristics of the arrestee, and/or the circumstances of the arrest." *Id.* at 802.[6]

Following *Weber*, for years this Circuit has repeatedly affirmed the rule that body cavity searches, particularly for misdemeanants, must be justified by an individualized reasonable suspicion. *See Hartline*, 546 F.3d at 100-01 (quoting *Weber*, 804 F.2d at 802) (citing persuasive authority for the proposition that "it is [not] reasonable to strip search every inmate booked on a drug related charge" and reasoning that otherwise "strip searches will become commonplace"); *see also Kelsey v. Cnty. of Schoharie*, 567 F.3d 54, 62 (2d Cir. 2009) (reiterating the Circuit's "long-standing precedent covering strip searches for those arrested for misdemeanors" and collecting cases) (citations omitted); *N.G. v. Connecticut*, 382 F.3d 225, 232 (2d Cir. 2004) (noting that "all the circuits to have considered this issue have reached the same conclusion"); *Shain v. Ellison*, 273 F.3d 56, 64-65 (2d Cir. 2001); *Wachtler v. Cnty. of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1994); *Walsh v. Franco*, 849 F.2d 66, 68-69 (2d Cir. 1988). For example, in *Shain*, we held "it was clearly established in 1995 that persons charged with a misdemeanor and remanded to a local correctional facility . . . have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons." 273 F.3d at 66. We

---

[6] In essence, this standard required more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Instead, the reasonable suspicion standard requires individualized suspicion, specifically directed to the person targeted for the strip search, and reasonable cause to believe that drugs or other contraband are concealed in the particular place to be searched with some indicia of reliability. *Hartline*, 546 F.3d at 100.

concluded the county's "visual body cavity search" of a misdemeanant absent reasonable suspicion violated the Fourth Amendment. *Id.*

Despite these consistent rulings rejecting the constitutionality of body cavity searches, appellees and the majority persist in arguing that the rule was not clearly foreshadowed, because in this case Gonzalez was arrested for a *felony*, and the Second Circuit cases deal exclusively with *misdemeanors*. Appellees argument fails, however, because this Court and the Supreme Court had both clearly foreshadowed that the heightened standard applied regardless of a person's status.

In *Shain*, we recognized, "we long had stressed the intrusive nature of body cavity searches." *Id.* at 63. In addition to this guiding principle, we stated that whether our heightened standard applied to felony arrestees was at least an open issue, *id.* at 64,[7] and intimated that if this Circuit was asked that question, we would likely resolve it in Gonzalez's favor given that status should not affect a person's rights, *id.* at 66 n.3.[8] Although not explicitly held, this suggestion was echoed by the Supreme Court's in *Tennessee v. Garner*, 471 U.S. 1, 14 (1985), which undermined the distinction between a felon and a misdemeanant as "untenable." Thus, this Court and the Supreme Court both suggested that all body cavity searches must be conducted according to a heightened

---

[7] Though we did also state, "[t]here is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates." *Shain*, 273 F.3d at 64 n.2

[8] In a footnote, we stated that "we do not rely solely on Shain's status as a pretrial detainee" in order to find that this search violated the Fourth Amendment. *Shain*, 273 F.3d at 66 n.3.

8

standard regardless of a person's arrestee status. As Appellees admit in their brief, "the distinction between the types of searches was evolving" in this direction. Appellees' Br. at 16.

Guided by these cases, the Southern District of New York came to this exact conclusion. It held that, the language of the Supreme Court and this Circuit foreshadowed that the stringent standard for body cavity searches applies to felony arrestees as well as misdemeanants. *See Sarnicola v. Cnty. of Westchester*, 229 F. Supp. 2d 259 (S.D.N.Y. 2002); *Murcia v. Cnty. of Orange*, 226 F. Supp. 2d 489 (S.D.N.Y. 2002); *Dodge v. Cnty. of Orange*, 209 F.R.D. 65 (S.D.N.Y. 2002).[9] In *Murcia*, the district court, like the majority here, acknowledged that "the Second Circuit has not spoken directly to the appropriate test for the validity of a strip search."

However, unlike the majority, it correctly asked if this rule was clearly foreshadowed despite "the absence of specific authority directly on point." *Varrone*, 123 F.3d at 79. Applying that analysis, the district court observed that this "Circuit has held blanket policies subjecting all newly-arrested misdemeanor detainees in a local correctional facility to visual body cavity searches are unconstitutional." *Murcia*, 226 F.

---

[9] The majority tries to disclaim these holdings because they were decided by a single judge in the Southern District of New York. However, I know of no case law which holds that the singularity of a judge undermines the weight of the decision. Regardless this judge was not alone. Other judges in our district courts have observed this rule. *See Sims v. Farrelly*, No. 10 Civ. 4765, 2013 WL 3972460, at *8 (S.D.N.Y. Aug. 2, 2013); *Sorrell v. Inc. Vill. of Lynbrook*, 2012 WL 1999642, at *6 (E.D.N.Y. June 4, 2012); *McBean v. City of New York*, 260 F.R.D. 120, 130 (S.D.N.Y. 2009); *Harriston v. Mead*, No. 05 CV 2058, 2008 WL 4507608, at *3 (E.D.N.Y. Sep 30, 2008).

Supp. 2d at 493.  The *Murcia* court also stated that the Supreme Court wrote in *Garner* that, "[i]n the context of Fourth Amendment searches and seizures . . . the distinction between felonies and misdemeanors is minor and often arbitrary," *Id.* at 494 (internal quotation marks omitted).[9]  It concluded,

> Coupling [the Supreme Court's] words with the Second Circuit's strong statements about constitutional protections for strip searches of accused misdemeanants, [allows for the conclusion] that the law in this Circuit does not countenance a policy mandating strip searches of all felony arrestees simply because they stand accused of felonies.

*Id*. at 494.  Having correctly determined we "clearly foreshadowed" the rule, the court then held, "[t]he 'individualized reasonable suspicion' rule should apply to accused felons as well as misdemeanants upon arrival at a local correctional facility." *Id.*

In *Sarnicola*, the lower court once again came to the same conclusion.  It stated that although this "Circuit ha[d] not spoken directly to the appropriate test for the validity of a strip search incident to a felony arrest, [the district court in *Murcia*] recently opined that the Court of Appeals would apply the particularized reasonable suspicion test to searches of felony arrestees as well" because "[i]n the sixteen years following *Weber*, the Second Circuit has firmly held that strip searches of persons lawfully arrested for minor infractions (misdemeanors and violations) must be justified by an individualized reasonable suspicion of concealed weapons or contraband." *Sarnicola*, 229 F. Supp. 2d at

---

[9]  The district court also cited to *Garner* for the proposition that "[m]any crimes classified as misdemeanors, or nonexistent, at common law are now felonies," and "numerous misdemeanors involve conduct more dangerous than many felonies." *Murcia*, 226 F. Supp. 2d at 494.

10

269-70. The lower court also observed that the Supreme Court had previously stated that "the assumption that a 'felon' is more dangerous than a misdemeanant [is] untenable." *Id.* at 270 n.4 (citing *Garner*, 471 U.S. at 14). Thus, finding the rule had already been forecast, it stated that "no constitutional prerogative [exists in creating a distinction for felony arrests in order to] strip search individuals in the absence of particularized reasonable suspicion that they are carrying drugs or contraband." *Id*. at 270.

In these cases, the district court drew from the principles and inferences made by our Circuit and the Supreme Court for nearly two decades to deduce the foreshadowed conclusion that the individualized reasonable suspicion rule should apply to searches so intrusive regardless of a person's status.

The district court was not alone in its deduction. In *People v. More*, 97 N.Y 2d 209, 214 (2002), and then *People v. Hall*, 10 N.Y.3d 303, 310-11 (2008), the New York Court of Appeals also found that an anal cavity search of a felony arrestee had to meet a heightened standard. In *More*, officers arrested a defendant in his home in close proximity to what appeared to be drugs. *More*, 97 N.Y.2d at 212. The initial "pat-down" yielded no evidence of drugs, but, regardless, police conducted an anal cavity search. *Id.* The New York Court of Appeals held the body cavity search of defendant incident to his arrest was unreasonable and invalid, and drugs seized from his rectum must be suppressed because the Fourth Amendment requires a "clear indication" that contraband will be

11

found, in order to make the more intrusive search, "beyond the body's surface."  *Id.* at 212-13.[10]

In *Hall*, the New York Court of Appeals once again held that "because a manual cavity search is more intrusive" a heightened standard must exist, regardless of a person's felony status.  *Hall*, 10 N.Y.3d at 310-11.  The court stated,

> To advance to the next level required for a visual cavity inspection, the police must have a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity and the visual inspection must be conducted reasonably.  If an object is visually detected or other information provides probable cause that an object is hidden inside the arrestee's body, *Schmerber* dictates that a warrant be obtained before conducting a body cavity search unless an emergency situation exists.

*Id.*  The court noted that "visual cavity inspections . . . cannot be routinely undertaken as incident to all drug arrests or permitted under a police department's blanket policy that subjects persons suspected of certain crimes to [this] procedure[]."  *Id.* at 311.

Despite Supreme Court precedent and over two decades of this Circuit's case law rejecting cavity searches, the district court stated and Appellees still contend that the rule

---

[10] Since then, state courts have continued to hold that rule.  For example, more recently, that rule was applied in a case with a similar fact pattern to the case at hand.  In *People v. Robinson*, the Supreme Court of New York County found that although police had probable cause to arrest the defendant after observing him sell cocaine, the police's strip search was unreasonable.  *People v. Robinson*, 39 Misc. 3d 1234(A), at *3 (N.Y.Sup. Ct. 2013) ("There was no evidence that the [search] was based on any particularized facts that led police to believe that this particular defendant was concealing evidence beneath his clothes.")

12

was not clearly established until *Hall*, 10 N.Y.3d at 310-11.[11]  Regardless of *Hall*, the rule established therein was already clearly suggested by the Supreme Court and presaged by this Circuit.  As the majority states, "we have repeatedly held that police may not conduct a suspicionless strip or body cavity search."  Even if no federal case prior to *Hall* stated the rule as explicitly applying to felony arrestees, the waterfall of decisions from *Schmerber* to *Weber* to *Shain* to *Murcia* made *Hall*'s and *Sarnicola*'s ultimate results a fait accompli–as reflections of this Circuit's developing case law.  In addition, even Appellees are in accord with the district court and the New York Court of Appeals, recognizing that the rule on searches was  "evolving" in this direction.  Appellees' Br. at 16.  We have held that such foreshadowing requires the rule to be deemed clearly established.  *See Varrone*, 123 F.3d at 78-79; *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010).  Accordingly, where the Supreme Court and this Court clearly foreshadowed a

---

[11] The majority correctly clarifies the present question is not just whether there was a clearly established rule but whether there was a clearly established *federal* constitutional right.  Therefore, *Hall* is not determinative.  But what the majority fails to notice is that *Hall* stated it was only reaffirming pre-existing law of the Supreme Court.  The New York court recognized, "the rule announced in *Schmerber* is unequivocal . . . searches involving intrusions beyond the body's surface" require some stricter standard.  *Hall*, 10 N.Y.3d at 313 (citing *Schmerber*, 384 U.S. at 769).  *Hall* thus clarified it was not a new rule but a directive from the Supreme Court's holding in *Schmerber*.  *Id.* at 310 ("*Schmerber* . . . dictates that a more stringent standard be applied to a physical search of an arrestee's body cavity").  Moreover, that case opined that the state court had itself adopted this rule previously in *More*.  The *Hall* court stated, "[in o]ur most recent decision addressing a search into a person's body[,] *People v. More*, 97 N.Y.2d 209 (2002) . . . . We recognized that a search of this nature was at least as intrusive as the blood test procedures in *Schmerber* . . . [and] we held that the removal of the object from the defendant's rectum without prior judicial authorization violated the Fourth Amendment."  *Hall*, 10 N.Y.3d at 310 (internal quotation marks and alteration omitted).

13

ruling on the issue, and other courts have also acknowledged this outcome, we should conclude that the rule was clearly established.

### III.

Moreover, "[e]ven in the absence of binding precedent, a right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. The unlawfulness must be apparent." *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998) (citing *Anderson*, 483 U.S. at 640) (internal quotation marks and alterations omitted). "Officials are held to have constructive knowledge of established law." *Salahuddin v. Coughlin*, 781 F.2d 24, 27 (2d Cir. 1986).

The majority admits "we have repeatedly held that police may not conduct a suspicionless strip or body cavity search" and also that "we can expect police officers to be familiar with black-letter law." It further states, "[t]he officers do not dispute that the search violated Gonzalez's right to be free from unreasonable searches." However, still it somehow concludes that "reasonable officers could disagree as to whether that rule applied to those arrested for felony drug crimes." I do not agree. An objectively reasonable officer, familiar with our case law, would certainly have understood that conducting Gonzalez's suspicionless body cavity search was unlawful. In addition to cases in this Circuit having consistently affirmed that cavity searches require heightened particularity, *Hall* pronounced, "[o]ur precedent on this point [as to felony arrestees] is unequivocal," *Hall*, 10 N.Y.3d at 311, thus demonstrating that officers with presumed knowledge of the law were clearly on notice.

14

In addition the initial search and pat down revealed no protruding object. Without more particularized suspicion—that the evidence sought was likely to be found within Gonzalez's body—no officer could have concluded the cavity search was reasonable. Unlike other circumstances where a "small hard object" was detected in a defendant's initial strip search, Gonzalez's initial strip search did not reveal any hard objects. *Cf. People v. Clayton*, 57 A.D.3d 557, 558 (N.Y. App. Div. 2008). Therefore, as in *Schmerber*, absent some more, clear indication of Gonzalez harboring drugs or other paraphernalia, the cavity search was a clear violation of plaintiff's Fourth Amendment rights, such that no officer could find it reasonable.

The facts here are also distinguishable from *Clayton*, 57 A.D.3d 557, where the searching officer testified that the defendant had a history of secreting contraband. *Id.* at 559. Here, "Gonzalez was not a target of the police's buy bust operation." *Gonzalez*, 2011 WL 6010910, at *1 n.1. Therefore, we may assume the police had no background information on Gonzalez, his connection to the drug trade, or his history as to secreting contraband. Thus, the officers lacked requisite information for the body cavity search to be considered reasonable and unjustifiably still conducted a suspicionless search.

Here, the only thing giving police suspicion that Gonzalez was secreting contraband was "defendant's statement that he *could* get" drugs, having said, "*I can get you* whatever you need." However, that statement did not explain 1) what kind of drugs; 2) what amount; or 3) when the sale would occur. As the Appellate Division in this case stated, "[Gonzalez's] representation that he could 'get you whatever you need' was vague

as to whether he actually possessed narcotics at the time and did not provide a specific, articulable basis to prompt the visual cavity inspection." *Gonzalez*, 57 A.D.3d at 1222. In fact, Gonzalez's use of the future tense suggests the opposite conclusion, that he had no drugs on his person and therefore *could* get it if requested. *See Schmerber*, 384 U.S. at 769-70 ("the Fourth Amendment . . . forbid[s] any such intrusions on the mere chance that desired evidence might be obtained.")

Moreover, even accepting that the strip search of the defendant was in accordance with police procedure, that, too, does not excuse police who should have known that to perform a strip search of the defendant absent reasonable suspicion was unjustified. *See Hartline*, 546 F.3d at 100-01 ("even if there were a departmental policy of strip searching all arrestees without making any assessment of particularized circumstances, the relevant question is still: Do the circumstances of [the] arrest support a reasonable suspicion that she was secreting contraband on her person?").

Accordingly, where the unlawfulness was "apparent," *Anderson*, 483 U.S. at 640, and the searching officers suspicion was based on "vague" information, an objectively reasonable person in the officer's position should have known that this conduct was unreasonable and qualified immunity should therefore not apply.

**IV.**

The gross violation of personal privacy cannot be outweighed by the government's interest where only a mere chance existed that the desired evidence would be obtained. "There is no iron curtain drawn between the Constitution and the prisons of this country."

16

*Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974). Included in those constitutional rights "when it comes to the Fourth Amendment," is the rule that "the home is the first among equals." *Florida v. Jardines*, 33 S. Ct. 1409, 1413-14 (2013). It is at the Amendment's "'very core.'" *Id*. As a person's body is the ultimate home, it must be at the nucleus of the Amendment. Thus, an invasion into the body is just as much—if not even more—extreme in practice than an intrusive entry into a home. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976) (explaining that body searches are "ordinarily afforded the most stringent Fourth Amendment protection"). In fact, the Court has recently reaffirmed its commitment to the reasonableness inquiry and *Schmerber* rule, as touchstones of the Fourth Amendment analysis. *See McNeely*, 133 S. Ct. at 1565. ("We have never retreated, however, from our recognition that any compelled intrusion into the human body implicates significant, constitutionally protected privacy interests.")

Therefore, these protections stand regardless of a person's arrestee status. The proscription against unreasonable body cavity searches, held as a consistent and core rule of the Fourth Amendment, should not be ignored simply because of an arbitrary distinction as to a person's status. To hold otherwise suggests that body cavity searches are so commonplace that we do not treat them as the ultimate invasive search. *See Veronia*, 515 U.S. at 672 (stating these are the "most intrusive searches"). Such a conclusion is unacceptable in any society that takes privacy, dignity, and bodily integrity seriously.

17

## V.

For these reasons, I respectfully dissent as to Part III of the majority's opinion.